**WEIL, GOTSHAL & MANGES LLP**

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jared R. Friedmann
Jacqueline Marcus
Jennifer Brooks Crozier

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : | **Case No. 18-23538 (RDD)** |
| Debtors.[1] | : | **(Jointly Administered)** |

------------------------------------------------------------x

| | | |
|---|---|---|
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : | |
| | : | |
| **Plaintiffs,** | : | |
| v. | : | **Adv. Proc. No. 21- _____ (RDD)** |
| | : | |
| **1055 HANOVER, LLC and 1 IMESON PARK** | : | |
| **BLVD, LLC,** | : | |
| **Defendants.** | : | |

------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is c/o M-III Partners, LP, 1700 Broadway, 19th Floor, New York, NY 10019.

## ADVERSARY COMPLAINT FOR TURNOVER OF ESTATE PROPERTY

Plaintiffs Sears Holding Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), by and through their attorneys, Weil, Gotshal & Manges LLP, file this adversary proceeding pursuant to 11 U.S.C. § 542, 28 U.S.C. § 2201, and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") against 1055 Hanover, LLC (the "**Hanover Landlord**") and 1 Imeson Park Blvd, LLC (the "**Imeson Landlord**") (collectively, the "**Landlords**" or the "**Defendants**") and allege as follows:

## NATURE OF THE ACTION

1.      The Debtors bring this adversary complaint against the Defendants to obtain turnover of prepaid rent that is property of the estates.  The Debtors entered into lease agreements with each of the Landlords and, under each lease, prepaid twelve months rent at the outset of the lease.  The Landlords held the prepaid rent in what amounted to a trust until the month the funds were to be applied to the Debtors' rent obligations.  Six months into the applicable lease terms, the Debtors rejected both leases in connection with these chapter 11 proceedings.  At the time of rejection, there was an additional six months of prepaid rent being held by Landlords that had not yet been applied to the Debtors' obligations under the leases.

2.      Although the Landlords' right to the additional six months of prepaid rent had not accrued at the time the Debtors rejected the leases, the Landlords continue to retain custody and control of this additional prepaid rent—more than $3 million in total—which rightfully belongs to the Debtors' estates.  Despite the Debtors' repeated requests to the Landlords to return this estate property, the Landlords have refused to relinquish the funds, seeking for themselves a windfall at the expense of the estates and their other creditors.  The Landlords also have refused

WEIL:\97815141\45\73217.0004

to agree that the Debtors can offset the Landlords' pending administrative expense claims with the unused prepaid rent.

3.      The purpose of turnover is to marshal the assets of the estate for the benefit of all creditors and to ensure that all creditors are treated fairly and equitably.  By refusing to turn over more than $3 million of the estates' property held in trust, the Landlords are attempting to circumvent the Bankruptcy Code and, in doing so, frustrating its purpose.  Accordingly, the Debtors respectfully request that the Court compel the Landlords to turn over the unused rent and grant the Debtors any further relief, at law or in equity, to which they are entitled.

## JURISDICTION AND VENUE

4.      Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  This adversary proceeding, brought pursuant to Section 542 of the Bankruptcy Code and Rule 7001(1) of the Bankruptcy Rules, arises from and is related to these chapter 11 cases (the "**Chapter 11 Cases**").

5.      The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

6.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and 28 U.S.C. § 157 (b)(2)(E) (orders to turn over property of the estate).

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

8.      The plaintiffs are the Debtors in these Chapter 11 Cases.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in

WEIL:\97815141\45\73217.0004

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 24, 2018,

the United States Trustee for Region 2 appointed an official committee of unsecured creditors in

connection with the Chapter 11 Cases.  The Chapter 11 Cases are being jointly administered for

procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.  On October 15, 2019,

the Bankruptcy Court confirmed the *Modified Second Amended Joint Chapter 11 Plan of Sears*

*Holdings Corporation and Its Affiliated Debtors* (as amended, supplemented, or modified in

accordance with its terms, the "**Plan**") [ECF No. 5370].  The Plan has not yet gone effective.

9.      Before the Commencement Date, the Debtors operated a large retail

business in forty-nine states, Guam, Puerto Rico, and the U.S. Virgin Islands.  Among other things,

the Debtors sold products in the appliance, tool, lawn and garden, fitness equipment, and

automotive repair and maintenance sectors.  As of the Commencement Date, the Debtors operated

687 department stores under the brand names Sears and Kmart.

10.     On information and belief, Defendant Hanover Landlord is a limited

liability company organized under the laws of the State of California, with its principal place of

business in Irvine, California.  On information and belief, Defendant Hanover Landlord is a

company which, among other things, owns and leases certain real property, including the property

at issue in this proceeding.

11.     On information and belief, Defendant Imeson Landlord is a limited liability

company organized under the laws of the State of California, with its principal place of business

in Irvine, California.  On information and belief, Defendant Imeson Landlord is a company which,

among other things, owns and leases certain real property, including the property at issue in this

proceeding.

WEIL:\97815141\45\73217.0004

12.     On information and belief, the Defendants are affiliates that are both owned and operated by LPA Realty, LLC.  On information and belief, LBA Realty, LLC is a full service real-estate investment and management company.

## FACTUAL BACKGROUND

### A.     The Debtors' Unused Prepaid Rent

13.     On April 5, 2018, the Debtors entered into two separate lease agreements: one lease with the Hanover Landlord for the property located at 1055 Hanover Street, Wilkes Barre, Pennsylvania (the "**Hanover Lease**"),[2] and another with the Imeson Landlord for the property located at 1 Imeson Park Boulevard, Jacksonville, Florida (the "**Imeson Lease**"[3] and, together with the Hanover Lease, the "**Leases**").

14.     At the commencement of the Leases, the Debtors prepaid $3,710,035.10 of rent under the Hanover Lease and $2,385,798.90 of rent under the Imeson Lease (collectively, the "**Prepayments**").  Pursuant to the Leases, the Prepayments were to be held by the Landlords until they were to be applied toward "Monthly Fixed Rent" for each property, for the period from November 2018 through October 2019, which would be months seven through eighteen of the Leases.  *See* Ex. 1 (Hanover Lease) at § 36; Ex. 2 (Imeson Park Lease) at § 36.

15.     The Debtors complied with the terms of each of the Leases and timely paid the Monthly Fixed Rent to the Landlords for months one through six.  Pursuant to the terms of each of the Leases, beginning with month seven of the Leases (November 2018), the Monthly Fixed Rent was to be debited against the Prepayments for each of the Leases.

---

[2] A copy of the Hanover Lease is attached hereto as **Exhibit 1.**
[3] A copy of the Imeson Lease is attached hereto as **Exhibit 2.**

16.     The Debtors commenced these Chapter 11 Cases on October 15, 2018 (during month six of the Leases), before the Landlords ever debited any of the Monthly Fixed Rent against the Prepayments.

17.     From November 2018 until April 2019 the Prepayments were appropriately debited and applied as Monthly Fixed Rent for each of the Leases.  On April 30, 2019 (the end of the twelfth month of the eighteen-month Leases) the Debtors rejected both of the Leases.  ECF No. 3449 at 6.  By rejecting the Leases, the Debtors terminated their obligation to pay the Monthly Fixed Rent going forward.

18.     At the time the Debtors rejected the Leases, the Monthly Fixed Rent for months thirteen through eighteen of the Leases had not yet accrued and, therefore, the Prepayments for those months remained property of the estates.

19.     The amounts of the Prepayments retained by the Hanover Landlord and the Imeson Landlord are $1,887,505.50 and $1,210,528.50, respectively, for a total of $3,098,034.00 (the "**Unused Prepaid Rent Amounts**").

**B.     Applicable Terms of the Leases**

20.     The relevant provisions of the Leases are identical.

21.     The Leases define the Prepayments as "an amount equal to . . . twelve (12) months of Monthly Fixed Rent otherwise due during months seven (7) through eighteen (18) of the Term (the '**Prepaid Rent**') . . . ."  Ex. 1 (Hanover Lease) at § 36; Ex. 2 (Imeson Park Lease) § 36.

22.     Section 36 of each Lease further provides:

Provided Sears is not in default under this Lease beyond any applicable notice or cure period, Landlord shall apply the Prepaid Rent to Sears' obligation to pay Monthly Fixed Rent as and when due until the entire amount of the Prepaid Rent has been exhausted; provided, however, if this Lease is terminated due to a

WEIL:\97815141\45\73217.0004

> Landlord Default, casualty, condemnation, or the early termination rights described in Section 3 above, then Landlord shall promptly return the unapplied portions of the Prepaid Rent to Sears.

*Id.*  The Leases provide for only two options with respect to the Prepayments: either the Landlords may apply the Prepayments "as and when due" until exhausted or they are required to return the Prepayments.  *See id.*  The Leases are silent as to the treatment of the Prepayments in the event that Sears is in default; nowhere in the Leases are the Landlords granted the right to retain the Unused Prepaid Rent Amounts.  *See generally id.*

23.     The Leases also explicitly state that the Landlords are to return unused amounts of the Monthly Fixed Rent:  "If the Termination Date occurs on any day other than the last day of a calendar month, Sears will be entitled to a refund in an amount equal to Monthly Fixed Rent and Additional Rent therefore paid under this lease allocable on a per-diem basis to the remainder of the month."  Ex. 1 (Hanover Lease) at § 4(e); Ex. 2 (Imeson Park Lease) at § 4(e). Because the Prepayments comprise unused Monthly Fixed Rent, the same refund obligation applies, and, thus, the Landlords must return the Unused Prepaid Rent Amounts.

## C.   The Landlords' Administrative Expense Claims

24.     The Landlords have not only refused to turn over the Unused Prepaid Rent Amounts; they have actually asserted that the Debtors owe money to them:  each of the Landlords has asserted an administrative expense claim against the Debtors for the period between the Commencement Date and the rejection of the Leases.  The Hanover Landlord has asserted administrative expense claim #19713 for $75,560.49.   The Imeson Landlord has asserted administrative expense claim #19714 for $68,497.

25.     In the event that the Debtors do not prevail on their request for turnover of the Unused Prepaid Rent Amounts, the Debtors, nevertheless, have a right to offset the Landlords'

administrative expense claims against the Unused Prepaid Rent Amounts, and thus, should not have to pay the Landlords anything in respect of those claims.   However, in an email dated September 21, 2020, the Landlords objected to the Debtors offsetting the administrative expense claims against the Unused Prepaid Rent Amounts.   Instead, the Landlords continue to press for payment of their administrative expense claims.

### D.   The Debtors' Efforts to Recover the Funds

25.    On August 28, 2020, the Debtors contacted the Landlords in an effort to recover the Unused Prepaid Rent Amounts.   Again, on October 15, 2020, the Debtors (by and through their attorney, Weil, Gotshal & Manges LLP) contacted the Landlords and explained that bankruptcy courts have found where a tenant has paid rent in advance, the prepaid amount remained property of the estate and was thus subject to turnover.   But the Landlords rejected the demands to return the Unused Prepaid Rent Amounts.

## GROUNDS FOR RELIEF
## COUNT ONE
**(Turnover)**

26.    The Debtors repeat and re-allege each of the allegations asserted in paragraphs 1 through 25 above as though fully set forth herein.

27.    The Unused Prepaid Rent Amounts are estate property that is subject to turnover by the Landlords to the Debtors.   The Landlords' right to the Unused Prepaid Rent Amounts never accrued.   The Landlords' right to the Prepayments accrued on a monthly basis from months seven through twelve.   *See* Ex. 1 Hanover Lease at § 36; Ex. 2 Imeson Park Lease, § 36.   However, once the Debtors rejected the Leases on April 30, 2019 (at the end of the twelfth month of each Lease) that rejection terminated the Debtors' future obligation to pay the Monthly

Fixed Rent as an administrative expense claim.  Therefore, the Landlords have no right to the Unused Prepaid Rent Amounts.

28.    The Landlords currently are in possession, custody, and control of the Unused Prepaid Rent Amounts.

29.    The Unused Prepaid Rent Amounts constitute property that the Debtors may use in accordance with Section 363 of the Bankruptcy Code.  *See supra* ¶¶ 8, 13–19.

30.    The more than $3 million in Unused Prepaid Rent Amounts are not of inconsequential value to the Debtors' estates.  The Debtors could use those funds to make further distributions to holders of administrative expense claims or to pay additional expenses of the chapter 11 cases.

31.    Although the Unused Prepaid Rent Amounts were held in what amounted to a trust by the Landlords under the Leases, at all times they remained property of the estates and, therefore, must be turned over to the Debtors.

32.    Accordingly, the Debtors are entitled to an order compelling turnover of the Unused Prepaid Rent Amounts.

WEIL:\97815141\45\73217.0004

## **PRAYER FOR RELIEF**

33.     For the foregoing reasons, the Debtors respectfully request that the Court

enter an order under 11 U.S.C. § 542(a) of the Bankruptcy Code:

    i.     Compelling the Hanover Landlord to turn over $1,887,505.50, representing

       the Unused Prepaid Rent Amounts it holds;

    ii.     Compelling the Imeson Landlord to turn over $1,210,528.50, representing

       the Unused Prepaid Rent Amounts it holds; and

    iii.     Granting the Debtors such other and further relief, at law or in equity, to

       which they are entitled.

Dated:  February 23, 2021
      New York, New York

                   */s/  Jacqueline Marcus*
                   WEIL, GOTSHAL & MANGES LLP
                   767 Fifth Avenue
                   New York, New York  10153
                   Telephone:  (212) 310-8000
                   Facsimile:  (212) 310-8007
                   Jared R. Friedmann
                   Jacqueline Marcus
                   Jennifer Brooks Crozier

                   *Attorneys for Debtors*
                   *and Debtors in Possession*

WEIL:\97815141\45\73217.0004

## **EXHIBIT 1**

**HANOVER LEASE**

**LEASE**

BY AND BETWEEN

**SEARS HOLDINGS CORPORATION**, as tenant

AND

**1055 HANOVER, LLC**, as landlord

Dated as of April $\underline{5}$, 2018

Property:
1055 Hanover Street, Wilkes Barre, PA

## LEASE

_ **THIS LEASE** (this "**Lease**") is made as of the 5 day of April, 2018 ("**Effective Date**"), between **1055 HANOVER, LLC**, a Delaware limited liability company, having an office at 3347 Michelson Drive, Suite 200 Irvine, California 92612, ("**Landlord**") and **SEARS HOLDINGS CORPORATION**, a Delaware corporation, having an office at 3333 Beverly Road, Dept. 824RE, Hoffman Estates, Illinois 60179 ("**Sears**").

## W I T N E S S E T H:

**WHEREAS,** pursuant to that certain Purchase and Sale Agreement dated as of February 8, 2018, between Innovel Solutions, Inc. ("**Seller**"), as seller, and Landlord, (as assignee from LBA Realty LLC, a Delaware limited liability company) as buyer (as amended and assigned, the "**PSA**"), Seller agreed to sell to Landlord, and Landlord agreed to purchase from Seller the land more particularly described on **Exhibit A** attached hereto and the other property described in the PSA (collectively, the "**Property**");

**WHEREAS,** as a condition to the closing pursuant to the PSA (the "**Closing**"), immediately following the sale of the Property by Seller to Landlord, Landlord is required to lease to Sears, and Sears is required to lease from Landlord, the Premises (as defined below) pursuant to the terms and conditions of this Lease; and

**WHEREAS,** the Closing under the PSA occurred on the Effective Date and Sears and Landlord wish to enter into this Lease to complete the transaction.

**NOW, THEREFORE,** Sears and Landlord agree as follows:

1.    **Demise.** Landlord hereby leases to Sears, and Sears hereby leases from Landlord, the Premises for the Term. The "**Premises**" shall be defined as the premises described on **Exhibit B** attached hereto. Sears shall also have the right to use, in common with all other tenants and occupants of the Property on a non-exclusive basis, all parking, access and common areas useful in connection with the Property in a manner substantially similar to the manner in which same have been used prior to the date hereof, to the extent Landlord possesses or has the right to such rights. The Premises shall not include, and Landlord shall retain the sole and exclusive rights in, the leases listed on the attached **Schedule 1** (collectively, the "**Landlord Retained Leases**"). Landlord shall not amend or modify the Landlord Retained Leases without the prior written consent of Sears (which consent shall not be unreasonably withheld, and shall be granted or withheld within thirty (30) days of request), except only to the extent that neither Sears' operations nor Sears' rights hereunder are materially adversely affected by such amendment or modification. Without limiting the foregoing, no modification or amendment shall be made to any Landlord Retained Lease to increase the space used under such Landlord Retained Lease or which would result in any material increased cost to Sears without the prior written consent of Sears.



2.   **Term**.

(a)     The term of this Lease (the "**Term**") shall commence on the Effective Date and shall expire at midnight on the last day of the tenth (10th) Lease Year, unless sooner terminated as provided in this Lease.

(b)     If the date otherwise scheduled for termination or expiration of this Lease is not a Business Day, the Termination Date shall be on the first Business Day thereafter. A "**Business Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in the jurisdiction in which the Premises is located. A "**Lease Year**" means each successive twelve (12) calendar month period commencing on the first day of a calendar month. The first Lease Year shall be the twelve (12) month period commencing on the first day of the calendar month immediately succeeding the month in which the Term of this Lease commences plus any partial calendar month during the calendar month in which the Term of this Lease commences.

3.   **Early Termination; Surrender of Possession**.

(a)     **Early Termination By Landlord**. In addition to any early termination of this Lease that may arise under any other section of this Lease, Landlord may elect to terminate this Lease prior to the expiration of the Term, but only if such termination is effective after the last day of the sixtieth (60th) full calendar month of the Term; provided, that as a condition precedent to such termination, Landlord shall provide not less than nine (9) months' prior written notice of termination ("**Landlord Termination Notice**") to Sears. The Landlord Termination Notice shall indicate the date of the termination of this Lease, which must be a Business Day that does not occur between November 15 of a calendar year and January 15 of the next following calendar year and which must be after the last day of the sixtieth (60th) full calendar month of the Term.

(b)     **Surrender of Possession**. Upon the first to occur of (i) the expiration of the Term, (ii) any sooner termination of this Lease pursuant to any other section of this Lease, or (iii) any earlier date as noted in a validly delivered Landlord Termination Notice or Sears Termination Notice, as applicable (the first of such dates being the "**Termination Date**"), Sears shall surrender possession of the Premises in its "AS-IS," "WHERE-IS" and "WITH ALL FAULTS" condition, free of all subtenants, licensees, leases, subleases, concessionaires and other occupants claiming by, through or under Sears, and without any obligation by Sears, except as provided in the following sentence, to remove any fixtures, furnishings or equipment or other personal property. On or prior to the Termination Date, Sears shall remove any or all of Sears' furnishings, movable equipment, merchandise, inventory and other personal property and may (but shall not be required to) remove fixtures (including, without limitation, permanently affixed fixtures, such as racking and conveyor systems installed prior to the Effective Date) (all of the foregoing items noted in this sentence, collectively, "**Sears' Property**") and any alterations or improvements required to be removed by Sears pursuant to Section 5(a) below, including repairing any damage caused by such removal, ordinary wear and tear excepted. If Sears fails to remove any Sears' Property that is required to be removed, any of the same remaining after the Termination Date may be removed by Landlord at Sears' expense or retained by Landlord for its account.

4.   **Rent**.

(a)     As consideration for this Lease, Sears shall pay to Landlord annual fixed rent ("**Annual Fixed Rent**") during each Lease Year in the aggregate amounts set forth on **Schedule 2** attached hereto. The Annual Fixed Rent then in effect shall be payable in equal monthly installments ("**Monthly Fixed Rent**") in advance on or prior to the fifth (5th) day of each month. Monthly Fixed Rent shall be prorated on a per diem basis for any portion of a month.

(b)     As "**Additional Rent**" Sears shall also pay during the Term, in equal monthly installments, an amount equal to Landlord's insurance premiums for coverages applicable to the Property that Landlord purchases pursuant to this Lease (provided such insurance premiums, and the insurance coverages (including deductibles) purchased therewith are commercially reasonable and consistent with the types and amounts of coverages that would be purchased by prudent owners of properties similar in type to and in the general vicinity of the Property). Sears shall also pay any amounts due on a monthly basis for Required CapEx in accordance with Section 8(c)(i) below.

(c)     Sears shall also pay directly to the relevant authority as and when due, Taxes and, upon request by Landlord, shall provide Landlord with reasonable evidence that the same have been paid. For purposes hereof, "**Taxes**" shall mean all taxes and impositions relating to the ownership, leasing and operation of the Property, or any portion thereof, including the land, but excluding any excess profits taxes, franchise taxes, gift taxes, inheritance and succession taxes, estate taxes, documentary transfer taxes, federal or state income taxes, corporate, capital stock or capital gains taxes, penalties incurred as a result of Landlord's failure to pay taxes or to file any tax or informational returns and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Property).

(d)     Landlord shall give prompt notice to Sears of all Taxes and insurance premiums, payable by Sears hereunder of which Landlord at any time has knowledge and shall send copies of all bills and notices received by Landlord to Sears. Promptly after receipt of such notice of the actual amount of Additional Rent, such amount will be adjusted between Landlord and Sears in cash. Provided that Sears is not then in default under this Lease (beyond applicable notice and cure periods), Sears reserves the right to audit the books and records of Landlord with respect to any component of Additional Rent within one (1) year of the expiration of the year to which such Additional Rent relates.

(e)     If the Termination Date occurs on any day other than the last day of a calendar month, Sears will be entitled to a refund in an amount equal to Monthly Fixed Rent and Additional Rent theretofore paid under this Lease allocable on a per-diem basis to the remainder of the month.

(f)     The parties acknowledge and agree that Sears shall pay for all of the operating costs and expenses (such as, but not limited to, utility costs and phone service) in connection with Sears' use and occupancy of the Premises during the Term, in accordance with its customary practices, subject to Section 8 and Section 4, and except (i) for costs, expenses and damages resulting from the negligence or willful misconduct by Landlord or its agents, employees or contractors, but subject to the terms of Section 23(b) below, and (ii) as otherwise expressly set forth herein.

(g)     Annual Fixed Rent, Monthly Fixed Rent and Additional Rent shall be collectively referred to herein as "**Rent**."

(h)     For the avoidance of doubt, but subject to <u>Section 4</u>, Sears shall be solely responsible for payment of all Taxes from the beginning of the current tax year up to and including the Effective Date.  Subject to <u>Section 4</u>, all Taxes applicable to the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available tax bill and adjusted in cash once actual taxes are known.  Landlord shall give prompt notice to Sears of all Taxes payable by Sears hereunder of which Landlord at any time has knowledge.  Landlord shall use its reasonable efforts to obtain the cooperation of all taxing authorities to send all bills and notices in respect of the Property directly to Sears.

(i)     Sears may, at its own expense, contest or cause to be contested by appropriate legal proceedings conducted in good faith and with due diligence, any Taxes (including penalties and interest) upon or against the Property or any part thereof, including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no default under this Lease has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Landlord, Sears posts a bond or takes other steps acceptable to such taxing authority and/or Landlord that removes such lien or stays enforcement thereof; (iv) Sears shall promptly provide Landlord with copies of all notices received or delivered by Sears and filings made by Sears in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Sears to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings (or, if applicable, Sears will be entitled to any refund resulting therefore), the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.  Landlord shall, at the request of Sears, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Landlord shall incur no cost or obligation thereby.

(j)     Sears shall pay directly to the utility company(ies), the cost of all utilities provided to the Premises during the Term.

(k)     In light of the fact that Sears is continuing (i) in occupancy following the Closing, and (ii) to control the Service Contracts, except as set forth in the PSA, Sears and Landlord have not prorated common area maintenance reimbursements or payments under any Ancillary Rights and Agreements, expenses under Service Contracts, utilities and other customary real property prorations and adjustments as of the Closing.

5.     <u>**Alterations; "Going out of Business Sale"; Signage**</u>.

(a)     Except as otherwise provided herein, and subject to the rights of tenants under any Landlord Retained Leases, without first obtaining Landlord's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), Sears shall not make or cause to be made any alterations to the building structure or building systems or any other material alterations or install any additional permanent fixtures to the Premises.  Notwithstanding the

preceding sentence, Sears (and any of its subtenants, licensees or other occupants) shall not be required to obtain any consent from Landlord for (1) any minor or non-structural alterations to the Premises, (2) placing temporary signs on the Property in connection with its store-closing operations or (3) any non-structural alterations to the Premises in connection with any Necessary Curtailments, or any other reduction in business operations or reduction in utilizing space within the Premises that do not affect the exterior of the improvements or the building systems, or disturb any hazardous materials. "**Necessary Curtailments**" means alterations, ordinary repairs, Casualty, customary acts or events of force majeure, and events beyond the reasonable control of Sears. Notwithstanding the foregoing, Sears, at its expense, may at any time and from time to time make alterations and/or additions to the Premises, subject to Landlord's prior written consent (to the extent required pursuant to this <u>Section 5</u>) not to be unreasonably withheld, conditioned or delayed, provided that (A) the market value of the Premises shall not be reduced or its usefulness impaired, (B) the work shall be done expeditiously and in a good and workmanlike manner, (C) Sears shall comply with all legal requirements applicable to the work and (D) Sears shall promptly pay all costs and expenses and discharge any and all liens arising in connection with the work in accordance with the terms hereof. Notwithstanding the foregoing, Sears, at its expense, may install or assemble or place on the Premises, and remove and substitute (and repair any damage caused by such removal and substitution), any items of machinery, equipment, furniture, furnishings, trade fixtures or other Sears' Property, including, but not limited to, all conveyer and material handling systems and related equipment, used or useful in Sears' business; provided, that Sears shall be obligated to remove the same on or prior to the end of the Term in accordance with <u>Section 3(c)</u> unless Landlord shall have consented, at the time of installation, to the same remaining in place following the end of the Term.

(b)      Notwithstanding any provision herein to the contrary, but subject to the provisions hereof, Sears shall have the right to conduct a "going out of business sale" to be completed during the one hundred twenty (120) day period prior to the expiration of the Term or earlier termination of this Lease as provided herein and to cease store operations and to remove Sears' Property and prepare for the turnover of possession of the Premises to Landlord pursuant to the provisions of this Lease. With respect to a Sears "going out of business sale" and during the one hundred twenty (120) day period provided above, (i) Sears shall not place or allow the placement of any signage (including, but not limited to, banners, posters, placards and/or stand-alone signs, collectively "**GOB Signage**") on the exterior of the improvements (or on the interior of the improvements if such GOB Signage is visible from the exterior of the improvements) that contains the words/phrases "going out of business", "everything must go", "store closing", "liquidation sale", "complete liquidation" or phrases of similar wording and/or intent; provided that Sears may place GOB Signage with the words "Sears Store Closing" or "Sears Store Closing Sale" on the exterior of the improvements (or on the interior of the improvements which is visible from the exterior of the improvements) so long as such GOB Signage is professionally prepared and installed, and of a reasonable size; (ii) Sears' GOB Signage may include discount pricing information; and (iii) Sears shall not place or allow the placement of any GOB Signage on the exterior surface of the improvements (except as provided above) or within the common areas of the Property.

(c)      Sears shall have the option to erect and maintain, subject to applicable legal requirements and matters of title to which this Lease is subordinate and Ancillary Rights and Agreements, at its sole cost and expense, upon any portion of the Property or improvements, signs

of such height and other dimensions bearing such legend or inscription as Sears shall determine, and which are generally consistent in size and quantity with the signs in existence as of the Effective Date, and consistent with the nature and quality of the Property.

6.    **Use; Operation.**

(a)    Sears shall not have any obligation to continuously operate or use or conduct business in or on any portion of the Premises. Sears may use the Premises, if Sears operates at all, solely for the operation of a warehouse and distribution facility, and for purposes in connection with or incidental to the cessation of Sears' operations on the Premises as such, including, without limitation, the sale of Sears' Property located at the Premises. Sears shall, at Sears' sole cost and expense, use and operate the Premises, if Sears operates at all, in compliance with law, which obligations shall include without limitation (but subject to and without limiting the provisions of Section 4.12 of the PSA) the requirement that Sears obtain all zoning and occupancy permits necessary to occupy the Premises at its sole cost and expense; provided, however, that Sears shall not be obligated to perform any capital expenditures or structural improvements necessary in order to comply with law, except to the extent that such capital expenditure or structural improvements are necessitated by (subject in all respects to Sears' rights and determinations as provided in Section 8(c)(i) below) (a) any laws in effect and applicable to the Premises prior to the Closing Date, (b) any use of the Premises by Sears that is not substantially consistent with Sears' use as a warehouse and distribution facility, or (c) any alterations or improvements made by Sears to the Premises.

(b)    Without limiting the foregoing, Sears will continue to enjoy the benefit of all existing easements, parking agreements, rights of access and ingress, and all other rights and benefits as it currently enjoys (including under all applicable REAs and supplemental agreements, if any) with respect to the Property (all of the foregoing, collectively, "**Ancillary Rights and Agreements**"), and in furtherance thereof, Landlord agrees to enforce (and cause its Affiliates to enforce) all such Ancillary Rights and Agreements (excluding operating covenants) for the benefit of Sears. Sears agrees to continue to comply with the non-monetary provisions (if any) of the Ancillary Rights and Agreements that are applicable to the Premises (which, for the avoidance of doubt, does not include property that is subject to a Landlord Retained Lease) in accordance with its past practices in the ordinary course of business. Landlord shall not terminate, amend or modify the Ancillary Rights and Agreements without Sears' consent (which consent shall not be unreasonably withheld, and shall be granted or withheld within thirty (30) days of request).

7.    **Access and Cooperation.** Upon not less than one (1) Business Day's prior notice to Sears, Landlord and its representatives shall have access to the Premises for purposes of visual inspections, and upon not less than five (5) Business Days prior notice to perform inspections and tests of the Property, in each case during normal business hours; provided, however, that in emergency circumstances Landlord and its representatives may have immediate access to the Premises at any time after making all reasonable attempts to contact Sears, but otherwise without the necessity of prior notice. In connection with any such access or entry, and in connection with any access or entry by or on behalf of Landlord to perform any work permitted or required to be performed by Landlord as provided herein, Landlord and its representatives shall (a) not unreasonably interfere with or disturb Sears' or any subtenant's, licensee's or other occupant's business operations at the Premises, and (b) promptly restore or repair any damage occasioned by

such access or entry. In addition, notwithstanding anything to the contrary contained herein, and without limiting any other provision herein, in connection with any work to be performed by Landlord as required or permitted herein, (i) Landlord shall notify Sears within a reasonable time prior to the commencement of such work and afford Sears the opportunity to have a representative present during the performance of such work, (ii) Landlord shall use commercially reasonable efforts to coordinate the timing, scope and location of such work with Sears, (iii) Landlord shall perform such work, or cause such work to be performed, expeditiously and in a good and workman like manner using industry standard methods, materials and finishes as reasonably selected by Landlord, (iv) all architects, engineers and other construction professionals engaged by or on behalf of Landlord shall be experienced, financially responsible and duly licensed in the jurisdiction in which the Property is located and charge competitive and otherwise reasonable rates, (v) all contractors engaged by or on behalf of Landlord shall be bondable, (vi) Landlord and its agents shall comply with good safety and security practices in performing the work and shall keep the Premises free from accumulations of waste and/or rubbish caused by or in connection with the work, (vii) Landlord shall, and shall cause its agents, to comply with all applicable laws in connection with the work and Landlord shall obtain all permits and authorizations necessary to conduct the work and (viii) Landlord shall maintain and cause its construction professionals to maintain customary insurance coverage with customary limits with respect to any work performed by or on behalf of Landlord. Each party shall indemnify, protect, defend and hold harmless the other against Loss resulting from the work performed (or required to be performed) by the indemnifying party (including, without limitation, any Loss resulting from the failure of the indemnifying party to perform the work as and when required hereunder), which indemnity shall survive the Termination Date.

8.   **Services and Repairs**.

(a)   Subject to the provisions of this Section 8 and the other terms and conditions of this Lease, Sears shall accept the Premises and Property in its existing condition as of the Effective Date, "as is," "where is," and "with all faults" and without any written or verbal representations or warranties whatsoever, whether express or implied, and except for any surviving provisions of the PSA and any ancillary documents executed in connection therewith, for the period of such survival.

(b)   Subject to the foregoing and the following provisions of this Section 8 and the other terms and conditions of this Lease, Landlord shall have no obligation to supply any services or make any ordinary repairs to the Premises or Property, the parties expressly intending that subject to the further provisions of this Section 8 and the other terms and conditions of this Lease, Sears' current arrangements for all other services and general maintenance and ordinary repairs shall continue at Sears' election unaffected during the Term (and Landlord shall not interfere with same).

(c)   Sears may, but shall have no obligation to, make capital expenditures as Sears deems necessary or desirable. Subject to the provisions hereinafter set forth and Section 5, Sears and not Landlord shall be responsible for all ordinary repair and maintenance of the Premises required to keep the Premises in good condition and repair (as reasonably determined by Landlord and Sears), and in any event, shall include all repair and maintenance required to comply with applicable law and remedy any condition that creates a health and safety concern, or could

reasonably be expected to result in material damage to the Premises (the "**Maintenance Standard**"), however, Landlord, and not Sears shall be responsible for performing any immediate required repair and maintenance to the Premises (i.e., to remedy a condition or circumstance that exists as of the Effective Date), and Sears shall reimburse Landlord for any such work completed within the Deferred Maintenance Period (as the same may be extended as provided herein), as additional rent, but Sears total out-of-pocket costs for such work shall not exceed the Deferred Maintenance Amount (as that term is defined below) in the aggregate, and further provided, however, the parties' obligations for performing and paying for capital expenditures is further provided below. For the avoidance of doubt, the immediate required repair and maintenance work described in the preceding sentence is separate from the Deferred Maintenance Work and Required CapEx and Sears' total costs in connection with the Deferred Maintenance Work and such immediate required repair and maintenance shall never exceed the Deferred Maintenance Amount.

(i)     Subject to the following terms of this Section 8(c)(i), Sears' obligation to maintain the Premises in accordance with the Maintenance Standard does not include the obligation to perform any capital expenditures, but includes certain obligations to pay for such capital expenditures as set forth below.

(A)     Notwithstanding anything to the contrary set forth herein, as of the date hereof, certain work (collectively, the "**Deferred Maintenance Work**") more particularly described on **Schedule 3** attached hereto, has not yet been performed by Sears, but is required to be performed in order to satisfy the Maintenance Standard. The parties agree that, Landlord, not Sears, shall be responsible for performing all of the Deferred Maintenance Work, at Sears' sole cost and expense, except as set forth below, and that Landlord shall substantially complete such work within twelve (12) months of the Effective Date (the "**Deferred Maintenance Period**"); provided that the Deferred Maintenance Period shall be extended on a day for day basis for each day Landlord is delayed in performing or completing the Deferred Maintenance Work as the result of any action or inaction by Sears or any of Sears' agents resulting from the requirements described in the last sentence of this paragraph, and any event force majeure, so long as Landlord has notified Sears of such event of force majeure or action or inaction by Sears or its agents that is causing such delay. The cost of the Deferred Maintenance Work in the aggregate amount of One Hundred Sixty One Thousand Dollars ($161,000.00) (the "**Deferred Maintenance Amount**"), shall be deducted from the "Purchase Price" (as defined in the PSA) and credited to Landlord at Closing. Landlord shall be responsible for all costs of the Deferred Maintenance Work in excess of the Deferred Maintenance Amount, and shall promptly return to Sears any Deferred Maintenance Amount which has not been used on or before the expiration of the Deferred Maintenance Period (as the same may be extended as provided herein). Landlord shall provide Sears with copies of all invoices associated with the Deferred Maintenance Work. Sears reserves the right to audit the books and records of Landlord with respect to the Deferred Maintenance Work for a period of one (1) year after the expiration of the Deferred Maintenance Period (as the same may be extended as provided herein). Without limiting any other provision hereof, Landlord shall (i) use commercially reasonable efforts to coordinate the timing, scope and location of the performance of the Deferred Maintenance Work with Sears, (ii) perform the Deferred Maintenance Work in a manner which does not unreasonably interfere with Sears' use and enjoyment of the Premises (or the use and enjoyment of the Premises by any subtenants, licensees or customers of Sears), and (ii) notify Sears within a reasonable time prior to the commencement of any Deferred Maintenance Work and afford Sears the opportunity to have a representative present during the performance of the

same, provided that any delay in the performance or completion of the Deferred Maintenance Work resulting directly or indirectly from the foregoing requirements shall extend the Deferred Maintenance Period as (and subject to the notice) indicated above.

(B)     In the event that a capital expenditure, besides the Deferred Maintenance Work, is appropriate or necessary to maintain the Premises consistent with the Maintenance Standard, as reasonably determined by Landlord or Sears (a "**Required CapEx**"), and the aggregate cost of such Required CapEx is reasonably estimated by Sears, together with all previous Required CapEx, to exceed $500,000, exclusive of any amounts paid by Sears for ordinary repairs and maintenance as provided in Section 8(b) (the "**Required CapEx Max**"), Sears does not have any requirement to perform or fund such Required CapEx, but Sears shall notify Landlord of the necessity and the cost (or reasonably estimated cost) of such Required CapEx. Landlord shall have the opportunity for a period of ten (10) business days after receipt of such notice from Sears to notify Sears that Landlord irrevocably commits to fund the amount of such Required CapEx in excess of the Required CapEx Max. If Landlord timely commits to fund such Required CapEx in excess of the Required CapEx Max, Sears shall make any such Required CapEx (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth above); provided that Sears shall reimburse Landlord for the amortized cost of such Required CapEx funded by Landlord (amortized over the useful life of the Required CapEx) on a monthly basis over the remainder of the Term in the event that the cost of such particular Required CapEx in excess of the Required CapEx Max funded by Landlord exceeds Two Hundred and Fifty Thousand Dollars ($250,000.00), and provided that Sears shall have no responsibility to reimburse Landlord for such amortized costs during the first two (2) years of the Term unless such Required CapEx in excess of the Required CapEx Max is necessary to address significant health and safety concerns in or on the Premises and Sears shall have no obligation to reimburse Landlord for the amortized costs of any Required CapEx that costs Two Hundred and Fifty Thousand Dollars ($250,000.00) or less. Alternatively, Landlord may elect to instead perform the Required CapEx in excess of the Required CapEx Max on behalf of Sears, at Landlord's sole cost and expense, subject to the foregoing reimbursement of annual amortized costs. If Landlord elects to perform the Required CapEx as provided above, Landlord shall do so on a timely basis and in consultation with Sears. If Landlord does not timely irrevocably commit to fund the amount of such Required CapEx or to perform the Required CapEx, in each case in excess of the Required CapEx Max, and the failure to perform the Required CapEx would create a health and safety concern, cause the Premises to fail to comply with applicable laws, or otherwise affect Sears ability to conduct business from the Premises, then Sears shall have the right to send a Sears Notice and follow the procedures set forth in Section 10(b).

(i)     Except as expressly set forth above and elsewhere in this Lease, Sears shall have no obligation to make any repairs or replacements or capital expenditures of whatever nature during the Term (except as and to the extent necessitated by Sears' failure to perform general maintenance with respect to the Premises in accordance with paragraph (c) above), but Sears may do so at any time at its election. Sears may continue to exercise and enforce exclusively any and all rights of the owner or landlord under the Service Contracts (including, without limitation, with respect to maintenance and upkeep of the Premises), and Landlord agrees to reasonably cooperate with Sears at no cost to Landlord in connection therewith.

9.     **Insurance; Casualty.**

(a)       Sears shall maintain all personal property and liability insurance programs presently in effect or as replaced by Sears from time to time in accordance with its general corporate policies throughout the Term; provided, however, at a minimum, Sears shall carry (i) commercial general liability insurance with limits of at least $15,000,000 per occurrence, (ii) commercial automobile liability coverage, and (iii) worker's compensation or other similar insurance pursuant to all applicable state and local statutes and regulations. Such policies shall name "Sears Holdings Corporation" as named insured thereunder and shall name Landlord and, at Landlord's request, such other persons or entities of which Sears has been informed in writing, as additional insureds thereunder, all as their respective interests may appear. Landlord shall maintain a "Lessor's Risk" policy of liability insurance, all-risk property damage insurance covering the Premises and other building improvements on the Property (including, but not limited to, earthquake and/or flood insurance), pollution legal liability coverage, and such other types and amounts of coverage that commercially reasonable and consistent with the types and amounts of coverages that would be purchased by prudent owners of properties similar in type to and in the general vicinity of the Property, and Sears shall pay to Landlord the costs of insurance maintained by Landlord in accordance with this Section 9(a), as set forth in Section 4 above and this Section 9(a). In addition, Sears shall reimburse Landlord as additional rent for any property insurance deductibles incurred during the Term, not to exceed $15,000 per claim. Landlord may maintain the foregoing coverages pursuant to a blanket and/or umbrella policy. Upon request from Landlord, Sears shall provide certificates of insurance evidencing that Sears is then satisfying the insurance requirements set forth above. Upon request from Sears, Landlord shall provide certificates of insurance evidencing that Landlord is then satisfying the insurance requirements set forth in this Lease.

(b)       This Lease shall terminate at the election of Sears upon the occurrence of a fire or other casualty ("**Casualty**") which results in material damage to the Premises (i.e., the portion of the Premises that is destroyed or damaged is twenty-five percent (25%) or more of the heated floor area of the Premises or the portion of the Premises that is destroyed or damaged materially affects Sears' use and occupancy of the Premises, with an appropriate prorated refund to Sears on a per-diem basis of all prepaid Monthly Fixed Rent and Additional Rent. If this Lease is not terminated pursuant to the preceding sentence, then in the event of a Casualty, all Monthly Fixed Rent and Additional Rent with respect to the portion of the heated floor area of the Premises which is affected by the Casualty, not usable and not actually used by Sears shall be abated on a per-square-foot basis. If this Lease is terminated as provided herein, Sears, at Sears' election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Sears), for the purpose of winding down its business operations and removing any or all Sears' Property at its election from the Premises, but Sears shall pay Rent at the rate set forth herein during the Lease Year in which the Casualty occurs for any period beyond such date of termination that Sears remains in possession of the Property (such Rent with respect to the portion of the Premises which is damaged shall be abated on a per-square-foot basis). To the extent that the Lease is terminated pursuant to this paragraph, neither Sears nor Landlord shall be obligated to make any repairs or restorations in the event of damage to the Premises resulting from a Casualty. If this Lease is not terminated pursuant to the preceding sentence, then in the event of a Casualty, Sears shall repair and restore the Sears' personal property to the extent deemed necessary or desirable by Sears in Sears sole discretion, but Sears shall only be obligated to repair and restore the Premises to the extent of proceeds of insurance made available by Landlord or to the extent Landlord pays all costs and expenses of such restoration. Notwithstanding the foregoing, this Lease shall not terminate as

the result of any Casualty that occurred prior to the Effective Date that did not result in Landlord (or its affiliate which is a party to the PSA) having a right to terminate the PSA.

(c) If Landlord shall be advised by a condemning authority or otherwise has knowledge of a proposed condemnation or other taking of the Property (or a portion thereof), then Landlord shall promptly give notice thereof to Sears. Upon any actual exercise by any governmental power (by legal proceedings or otherwise), by any public or quasi-public authority or by any other Person having the right of eminent domain or a voluntary sale or transfer by Landlord to any of the foregoing either under the threat of exercise of eminent domain or while legal proceedings for condemnation are pending with respect to a material portion of the Premises (i.e., twenty-five percent (25%) or more of the heated floor area of the Premises or the portion of Property taken materially affects the use and occupancy of the Premises) (collectively, a "**Condemnation Action**"), this Lease shall automatically terminate, except as provided below, as of the date on which title to the property subject to the Condemnation Action is vested in the condemnor. Sears, at Sears' election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Sears) after Sears receives notice of a Condemnation Action (but in no event later than the date of the actual Condemnation Action) during which to wind down its business operations and remove any or all of Sears' Property at its election from the Premises, and shall continue to pay Monthly Fixed Rent and Additional Rent for such period after the date this Lease automatically terminates. Sears shall not have any right to any portion of the proceeds of any award for a Condemnation Action, but shall have the right to make a separate claim for its loss of profit, relocation costs, goodwill, signage, personal property and trade fixtures and retain any award applicable thereto. Landlord shall cooperate with Sears in connection with such claim and Landlord shall not have any rights to recover any amounts in connection with such claim.

10.   **Default.**

(a)   **By Sears.**

(i)   Defaults by Sears are: (A) failing to timely pay Monthly Fixed Rent or Additional Rent, if such Monthly Fixed Rent and/or Additional Rent is not paid within seven (7) Business Days after receipt of written notice from Landlord of nonpayment; or (B) failing to observe or perform any other material obligations of Sears hereunder for a period of thirty (30) days after receipt of written notice from Landlord of such failure (or such longer period as may be reasonably required to cure such failure, provided that Sears is diligently prosecuting such cure to completion). In the event of any default by Sears that could reasonably be expected to result in material damage to the Premises (which, for the avoidance of doubt, includes Sears' failure to perform Required CapEx as and to the extent required in Section 8(c)(i)), Landlord may give Sears written notice ("**Landlord Notice**") of Landlord's intention to cure any or all such defaults of Sears. Sears may, within five (5) days of the receipt of a Landlord Notice, either (i) bring an action in any court of competent jurisdiction disputing the existence of such default, or (ii) notify Landlord of Sears' intention to promptly pay to Landlord the reasonable cost of curing such default(s) upon demand including reasonable documentation of the actual, out of pocket costs of Landlord in curing such default(s). If Landlord has proceeded to cure Sears' default after expiration of Sears' response period without response from Sears, then Sears shall promptly pay to Landlord such reasonable and documented actual out-of-pocket costs, provided that no action by Landlord in a court of competent jurisdiction remains outstanding with respect to the existence

of such default(s). As Landlord's additional remedy for a default by Sears, Landlord may give Sears written notice of Landlord's intention to terminate this Lease (the "**Default Termination Notice**") at the end of the expiration of thirty (30) days from the date of the giving of such Default Termination Notice, and, in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term. No default shall be deemed to exist under clause (B) during any time the curing thereof is prevented by Necessary Curtailments provided that upon the cessation of such Necessary Curtailments (subject to Section 9) Sears shall prosecute such cure without further delay.

(ii)     If (A) Sears becomes bankrupt, makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for Sears or for the major part of its property; (B) a trustee or receiver is appointed for Sears or for the major part of its property; or (C) any voluntary or involuntary proceedings are filed by or against Sears under any bankruptcy, insolvency or similar laws, Landlord may give Sears written notice of intention to terminate this Lease (the "**Bankruptcy Termination Notice**") at the end of the expiration of thirty (30) days from the date of giving such Bankruptcy Termination Notice, and, in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term.

(iii)    Upon any default by Sears under this Lease, Landlord may terminate this Lease and recover possession of the Premises. Once Landlord has terminated this Lease, Sears must promptly surrender the Premises to Landlord. On termination of this Lease, Landlord may recover from Sears all of the following; provided, that, in no event shall Sears be liable for any consequential, special, punitive or other similar damages:

(A)     The worth at the time of the award of any unpaid Rent that had been earned at the time of the termination; plus

(B)     The worth at the time of the award of the amount by which the unpaid Rent that would have been earned between the time of the termination and the time of the award exceeds the amount of unpaid Rent that Sears proves could reasonably have been avoided;

(C)     The worth at the time of the award of the amount by which the unpaid Rent for the balance of the Term after the time of the award exceeds the amount of unpaid Rent that Sears proves could reasonably have been avoided; provided, that, Sears shall be deemed to have delivered a Sears Termination Notice as of the earlier of the date of Sears' default giving rise to the termination of the Lease or the date of any actual delivery of a Sears Termination Notice; and

(D)     Any other amount necessary to compensate Landlord for all the detriment proximately caused by Sears' failure to perform obligations under this Lease, or which in the ordinary course of things would be likely to result therefrom, including any amounts incurred by Landlord to cure a default as provided in Section 10(a)(i) above, to the extent not otherwise paid by Sears.

(iv)    No member, partner (general or limited), manager, officer, director, shareholder or principal of Sears shall have any personal liability whatsoever for the payment or collection of any judgment requiring the payment of money by Sears in the event of a default by Sears with respect to the terms, covenants and conditions of this Lease to be observed and/or performed by Sears.

(v)    If Landlord does not elect to terminate this Lease on account of any default by Sears, Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover all Rent as it becomes due; provided, that, Sears shall be deemed to have delivered a Sears Termination Notice as of the earlier of the date of Sears' default giving rise to Landlord's right to terminate the Lease or the date of any actual delivery of a Sears Termination Notice.

(vi)    Without regard to the provisions of Section 10(a)(i) above, in the event that Sears shall pay any installment of Rent more than five (5) Business Days after the date on which such installment is due, Sears shall pay to Landlord a late fee in the amount of two percent (2%) of the amount not timely paid (the "Late Fee") promptly upon receipt of written notice from Landlord demanding payment of the same; provided, that not more than once per Lease Year, no Late Fee shall be due until such unpaid amount is more than twenty (20) calendar days past due. The Late Fee shall be Additional Rent, and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

(b)    **By Landlord.**

(i)    Defaults by Landlord are (i) failing to timely pay any amount to be paid by Landlord hereunder, if such amount is not paid within seven (7) business days after receipt of written notice from Sears of nonpayment; or (ii) failing to observe or perform any other material obligations of Landlord hereunder for a period of thirty (30) days after receipt of written notice from Sears of such failure (or such longer period as may be reasonably required to cure such failure, provided that Landlord is diligently prosecuting such cure to completion). In the event of any default by Landlord, Sears may give Landlord written notice ("**Sears Notice**") of Sears' intention to cure any or all defaults of Landlord. Landlord may, within five (5) days of the receipt of a Sears Notice, either (i) bring an action in any court of competent jurisdiction disputing the existence of such default, or (ii) notify Sears of Landlord's intention to promptly pay to Sears the reasonable cost of curing such default(s) upon demand including reasonable documentation of the actual, out of pocket costs of Sears in curing such default(s). If Sears has proceeded to cure Landlord's default, then following delivery of a second Sears Notice, delivered not less than five (5) days after the first Sears Notice related to such default, allowing Landlord five (5) days to repay Sears reasonable and documented actual out-of-pocket costs, and, provided that no action by Landlord in a court of competent jurisdiction remains outstanding with respect to the existence of such default(s), Sears may set off against the Rent all reasonable actual, out-of-pocket, cost of curing all defaults of Landlord (including any costs associated with an action brought by Landlord disputing the existence of such default(s) to the extent such court of competent jurisdiction finds that any such default did exist) at the end of the expiration of five (5) days from the date of the giving of such second Sears Notice; provided, however, that Sears' right to set off shall be capped at 50% of Monthly Fixed Rent in any one month, with any additional amounts to be carried forward

to the subsequent month(s). Sears shall also have the option in the Sears Notice, provided that no action by Landlord in a court of competent jurisdiction remains outstanding with respect to the existence of such default(s), to terminate this Lease at the end of the expiration of thirty (30) days from the date of giving such Sears Notice (or if Landlord is then pursuing the cure of the default, then such longer period as may be reasonably required to cure such default, provided that Landlord is diligently prosecuting such cure to completion), and in such event, this Lease and the Term shall, except as set forth in the following sentence, terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term. If this Lease is terminated as provided herein, Sears, at Sears' election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Sears), for the purpose of winding down its business operations and removing any or all of Sears' Property at its election from the Premises, but Sears shall continue to be obligated to pay Rent during any period of Sears' occupancy of the Premises. The provisions of this Section 10(b) shall survive the expiration or sooner termination of this Lease.

(ii)     No member, partner (general or limited), manager, officer, director, shareholder or principal of Landlord shall have any personal liability whatsoever for the payment or collection of any judgment requiring the payment of money by Landlord in the event of a default by Landlord with respect to the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord. In no event shall Landlord be liable for any consequential, special, punitive or other similar damages. Landlord's liability hereunder shall be limited to Landlord's interests in the Property.

11.    **Assignment/Subleasing**.

(a)     Sears shall have the right to sublet (and grant licenses and concessions, department arrangements and other rights) all or any portion of its leasehold interest during the Term without Landlord's approval; provided, however, that Sears shall not have the right to sublet all or any portion of its leasehold interest without Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed, if the term of such sublease is greater than two (2) years, unless Sears has an earlier termination right pursuant to such sublease (in which case Landlord shall not have such an approval right). Notwithstanding the foregoing, Sears shall have the right to sublet all or any portion of its leasehold interest to Seller during the Term without Landlord's approval. In addition, Sears shall have the right to assign its entire interest in this Lease, subject to Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed. In the event of any sublet or assignment, Sears (or any successor) shall remain liable to Landlord for the performance of all obligations under this Lease, except as otherwise set forth in Section 11(b) below.

(b)     Notwithstanding the foregoing, Sears shall have the right, without Landlord's approval, to (i) assign this Lease to any Subsidiary of Sears; (ii) assign or transfer all of Sears' rights and obligations under this Lease (either directly or indirectly, by operation of law or through a merger or other corporate transaction) to any other Person that (1) acquires all or substantially all of the assets of Sears, (2) is the surviving entity of a merger with Sears, or (3) results from a consolidation, reorganization or recapitalization of Sears with a solvent corporation, partnership or other legal entity; or (iii) assign or transfer all of Sears' rights and obligations under this Lease to any Person (if not the named tenant herein, the "**Unrelated**

Successor Tenant") that has concurrently acquired another similarly situated property from Sears and a net worth of not less than $25,000,000.00 as of the effective date of such assignment or transfer and the assignee assumes in writing the obligations of Sears under this Lease which arise on and after the date upon which the assignment becomes effective. In the sole case of an assignment or transfer in connection with clause (iii) above, Sears shall be released from all liability under this Lease. As used in this Lease, (x) "**Subsidiary**" means, as to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time of determination owned by such Person and/or one or more Subsidiaries of such Person, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person and/or one or more Subsidiaries of such person has more than a fifty percent (50%) equity interest at the time of determination and (y) "**Person**" or "**person**" means any natural person, partnership, limited partnership, limited liability company, corporation, trust, estate, association, unincorporated association or other entity. With respect to any assignment or transfer that requires Landlord's consent pursuant to Section 11(a) above or any assignment or transfer pursuant to this Section 11(b), Sears shall provide (i) written notice to Landlord no less than ten (10) Business Days prior to such assignment or transfer becoming effective, which notice shall identify the transferee and include reasonable documentation evidencing such transferee's satisfaction of the net worth requirement noted above, if applicable, and (ii) promptly following the date on which such assignment or transfer becomes effective, copies of the documentation evidencing the assignment of the Lease and the transferee's assumption of Sears' obligations under this Lease.

(c)     In the event of a sale or conveyance by Landlord of the Property (or any portion thereof), the same shall be made subject to this Lease and Landlord shall only be released from any liability under this Lease accruing after the date of any such conveyance, provided the assignee shall assume and agree to keep and perform all of the terms of this Lease on the part of Landlord to perform from and after the date of any such conveyance and a copy of the assignment and assumption agreement executed by Landlord and assignee shall be delivered to Sears, upon request.

12.     **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the state in which the Property is located applicable to agreements made, and to be wholly performed, in such state.

13.     **Waiver of Trial by Jury**. LANDLORD AND SEARS EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE OR THE LANDLORD-TENANT RELATIONSHIP, WHETHER ARISING IN CONTRACT, IN TORT OR OTHERWISE.

14.     **Binding Effect**. Subject to Section 11 above, this Lease shall bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

15.    **Complete Agreement; No Oral Modification**.  This Lease may not be altered or terminated, nor may its provisions be waived, except in a writing signed by Sears and Landlord. This Lease, together with the PSA and the documents referred to in the PSA or executed in connection with the Closing thereunder, represents the entire agreement and understanding of the parties with respect to the subject matter hereof, and completely supersedes and integrates any and all other promises, understandings and agreements between the parties (including all of the same by and between any of the parties' agents and representatives on behalf of the parties), both oral and written.

16.    **Counterparts**.  This Lease may be executed in two or more counterparts and by facsimile or electronic signatures which taken together shall constitute collectively one agreement. In making proof of this Lease it shall not be necessary to produce or account for more than one such counterpart with each party's original, facsimile or electronic signature.

17.    **Invalidity**.  If any term or provision of this Lease shall to any extent or for any reason be held invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be valid and enforceable to the fullest extent permitted by law, subject to such modification hereof as may be necessitated by such invalidity, illegality or unenforceability provided that the purpose and intent hereof is not in any way abrogated.

18.    **Notices**.

(a)    Notices shall be either (i) personally delivered, (ii) sent by a nationally recognized overnight courier delivery service, or (iii) mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If personally delivered, then such notices shall be effective when received as evidenced by affidavit of the Person making such delivery; if sent by overnight courier service then such notices shall be deemed to have been received by the addressee on the next Business Day following the date so sent; if mailed, then such notices or other communication shall be deemed to have been received by the addressee on the fifth (5th) Business Day following the date deposited with the United States mail. The inability to make delivery because of changed address of which no notice was given or by reason of rejection or refusal to accept delivery of any notice shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept. All notices, demands or requests made pursuant to, under or by virtue of this Lease must be in writing and addressed as follows:

If to Sears:

Sears Holdings Corporation
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention: President – Real Estate
Telephone: (847) 286-5303

With copies to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: W. Michael Bond, Esq.
Telephone: (212) 310-8035
Email: Michael.Bond@Weil.com

and

Sears Holdings Corporation
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention: Associate General Counsel – Real Estate
Telephone: (847) 286-1719

If to Landlord:

LBA Realty LLC
3347 Michelson Drive, Suite 200
Irvine, California 92612
Attention: Melanie Colbert
Telephone: (949) 955-9345
Email: mcolbert@lbarealty.com

With copies to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
1901 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Attention: Anton N. Natsis
Telephone: 310.788.2430
Email tnatsis@allenmatkins.com

(b)     All notices (i) shall be deemed to have been given on the date that the same shall have been delivered in accordance with the provisions of this Section and (ii) may be given either by a party or by such party's attorneys. Any party may, from time to time, specify as its address for purposes of this Lease any other address upon the giving of five (5) days' prior notice thereof to the other parties.

19.     **Subject to Existing Agreements**. This Lease is subject to all Ancillary Rights and Agreements in effect on the Effective Date with respect to the Property to the extent affecting the Premises or this Lease.

20.     **Liens**. Sears shall not permit any mechanic's, laborer's or materialman's lien or other liens or encumbrances to be filed at any time against the Property or any part thereof by reason of work performed, materials furnished or obligations incurred with prior authorization by or on behalf of Sears or any agent or contractor claiming by, through or under Sears, which are not bonded or discharged within the later of thirty (30) days (a) of filing or (b) Sears' actual notice

thereof. In the event that, following ten (10) Business Days' notice from Landlord to Sears indicating that the above thirty (30) day period has expired and Sears has failed to bond or discharge to relevant unpermitted lien or encumbrance, Landlord may, at the expense of Sears, bond or discharge such lien or encumbrance; provided, that if Sears notifies Landlord that Sears is actively disputing such lien or encumbrance, Landlord may only bond (and not discharge) such lien or encumbrance for so long as Sears continues to actively dispute the same.

21.     **Estoppels**. At any time and from time to time, upon not less than ten (10) Business Days' prior request, either party (the "**Requesting Party**") may request that the other party (the "**Certifying Party**") furnish to the Requesting Party (and its lenders or purchasers) a certificate (signed by a person duly authorized to sign on behalf of the Certifying Party) certifying as follows: (a) that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect and modified and setting forth the modifications), (b) the dates to which the Monthly Fixed Rent and any Additional Rent have been paid and the amount thereof then payable, (c) that the Certifying Party does not know of any default in the performance of any provisions of this Lease or specifying any default of which the Certifying Party may have knowledge and stating what action the defaulting party is taking or proposes to take with respect thereto and (d) any other information reasonably requested by the Requesting Party.

22.     If Sears is publicly traded, the terms of this Section 22 shall not apply. Otherwise, within thirty (30) days of Landlord's request, Sears will furnish its internally prepared financial statements. Landlord will not disclose any aspect of Sears' financial statements that Sears designates to Landlord as confidential except to Landlord's mortgagee or prospective mortgagees or purchasers of the Property or if required by law or court order. Sears shall not be required to deliver the financial statements required under this Section 22 more than once in any twelve (12) month period and only in connection with a sale or refinancing of the Property.

23.     **Indemnification; Waiver of Subrogation**.

(a)     Each party shall indemnify, defend and hold the other harmless from and against all claims, actions, damages, liability and expense, including reasonable attorneys' fees ("**Loss**"), in connection with bodily injury, the loss of life, personal injury and/or damage to property to the extent arising from or out of any occurrence in or upon the Property to the extent caused by any act or omission of the indemnifying party and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of the other party, its agents, contractors, employees, servants or licensees (as to all of which Loss the party charged with such acts or omissions shall indemnify, defend and hold harmless the other party).

(b)     Each party releases and waives any and every claim and right of recovery against the other which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, which loss or damage is customarily covered by the property insurance carried by each party under this Lease, or would have been covered if each party had carried the insurance that such party is required to carry under this Lease. This mutual waiver shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties. Landlord and Sears agree

to furnish to each insurance company which has or will issue property damage policies on its premises, notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

       (c)     The provisions of this Section shall survive the Termination Date.

     24.    **Hold Over**. No holding over by Sears nor acceptance of Monthly Fixed Rent, Additional Rent or other charges by Landlord shall operate as a renewal or extension of this Lease without the written consent of Landlord. Should Sears hold over after the Termination Date without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof; provided that, after the first thirty (30) days of holdover Sears' Monthly Fixed Rent shall be equal to one hundred twenty-five percent (125%) of the Monthly Fixed Rent otherwise due as of the date of the expiration or earlier termination of this Lease, and after the next thirty (30) days of holdover, Sears' Monthly Fixed Rent shall be equal to one hundred fifty percent (150%) of the Monthly Fixed Rent otherwise due as of the date of the expiration or earlier termination of this Lease. If Sears holds over without Landlord's express written consent, and tenders payment of rent for any period beyond the Termination Date by way of check (whether directly to Landlord, its agents, or to a lock box) or wire transfer, Sears acknowledges and agrees that the cashing of such check or acceptance of such wire shall be considered inadvertent and not be construed as creating a month-to-month tenancy, provided Landlord refunds such payment to Sears promptly upon learning that such check has been cashed or wire transfer received. Nothing contained in this Section 24 shall be construed as consent by Landlord to any holding over by Sears, and Landlord expressly reserves the right to require Sears to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease.

     25.    **Sears Financing**. Sears may continue to finance all receivables, inventory and other personal property and enter into financing leases of property and equipment, in the ordinary course of business.

     26.    **Subordination; Quiet Enjoyment**.

       (a)     Subject to and expressly conditioned upon the provisions of Section 26(b), including receipt of a commercially reasonable (as reasonably determined by Sears) subordination, nondisturbance and attornment agreement (an "**SNDA**") from each Landlord's mortgagee and each ground lessor, this Lease and all rights of Sears hereunder hereby are made and shall be subject and subordinate in all respects to the lien of all present and future ground leases (collectively, "**Ground Leases**") and mortgages (collectively, "**Landlord's Mortgages**") which may now or hereafter encumber Landlord's interest in the Property; provided that no such Ground Leases or Landlord's Mortgages shall increase any liabilities or obligations nor decrease any rights or remedies of Sears under or with respect to this Lease. Sears shall respond to any request for signing an SNDA within thirty (30) days after request therefor.

       (b)     Notwithstanding the foregoing or any such subordination, or any other provision contained in this Lease to the contrary, so long as Sears shall not be in default of the express provisions of this Lease beyond any applicable grace, notice or cure period, Landlord covenants and agrees that Sears shall peacefully and quietly possess and enjoy the Premises and

all rights of Sears under this Lease in accordance with all terms and conditions hereof (without reference to Section 26(a) hereof), without let, hindrance or disturbance and free from all rights and claims of Landlord and all of all Persons claiming by or through Landlord, including under any such Ground Leases and Landlord's Mortgages.

27.    **Attorneys' Fees**.  In the event of litigation between the parties to enforce this Lease or if any legal action is instituted as a result of a default by either party under this Lease that is not cured within the applicable cure period, the prevailing party in such action shall be entitled to recover from, or be reimbursed by the other party for, its reasonable and actual attorneys' fees and costs through all levels of proceedings.

28.    **Lease Not to Be Recorded; Leaseback Memorandum**.  The parties agree that this Lease shall not be recorded, but the parties shall record a leaseback memorandum concurrently with the execution hereof.

29.    **Discretion**.  Except as otherwise expressly provided herein, any agreement, approval, consent or other determination shall not be effective unless it is in writing and shall be in the sole and absolute discretion of such party.

30.    **Section Headings**.  The headings of the various sections of this Lease have been inserted only for purposes of convenience, are not part of this Lease and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Lease.

31.    **General Definitional Provisions**.

(a)    Unless the context of this Lease otherwise requires, (i) words of any gender are deemed to include each other gender, (ii) words using the singular or plural number also include the plural or singular number respectively, (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Lease, (iv) the terms "Article," "Section," "Subsection," "Paragraph" or "clause" refer to the specified Article, Section, Subsection, Paragraph or clause of this Lease, and (v) all references to "dollars" or "$" refer to currency of the United States of America. The term "including" as used herein shall in all instances mean "including, but not limited to."

(b)    Initially capitalized terms used in this Lease are defined on the respective pages indicated in the following list and if not defined in this Lease shall have the respective meanings ascribed to them in the PSA.

| | |
|---|---|
| Additional Rent ............................................ 4 | Default Termination Notice ........................ 13 |
| Ancillary Rights and Agreements ................ 7 | Deferred Maintenance Amount .................... 9 |
| Annual Fixed Rent ...................................... 4 | Deferred Maintenance Period ...................... 9 |
| Bankruptcy Termination Notice ................ 13 | Deferred Maintenance Work ........................ 9 |
| Business Day ............................................... 3 | Eastdil ........................................................ 2 |
| Casualty .................................................... 11 | Effective Date ............................................. 2 |
| Certifying Party ........................................ 19 | GOB Signage .............................................. 6 |
| Closing ....................................................... 2 | Ground Leases .......................................... 21 |
| Condemnation Action ............................... 12 | Landlord ...................................................... 2 |

| | | | |
|---|---|---|---|
| Landlord Notice | 13 | Rent | 5 |
| Landlord Retained Leases | 2 | Representatives | 2 |
| Landlord Termination Notice | 3 | Requesting Party | 19 |
| Landlord's Mortgages | 21 | Required CapEx | 10 |
| Late Fee | 14 | Required CapEx Max | 10 |
| Lease | 2 | Sears | 2 |
| Lease Year | 3 | Sears Notice | 15 |
| Loss | 20 | Sears' Property | 3 |
| Maintenance Standard | 9 | Seller | 2 |
| Monthly Fixed Rent | 4 | SNDA | 21 |
| Necessary Curtailments | 6 | Subsidiary | 16 |
| person | 16 | Taxes | 4 |
| Premises | 2 | Term | 3 |
| Prepaid Rent | 2 | Termination Date | 3 |
| Property | 2 | Unrelated Successor Tenant | 16 |
| PSA | 2 | | |

32.  **Joint Drafting.**  Each of Sears and Landlord has been represented by counsel in the negotiation and execution of this Lease, and each of Sears and Landlord had input in the drafting of this Lease. For all purposes, this Lease shall be considered to have been jointly drafted by Sears and Landlord.

33.  **Other Documents.**  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

34.  **Brokers.**

(a)  Sears represents and warrants to Landlord that Sears has not dealt with any broker, salesman, finder or consultant with respect to this Lease or the transactions contemplated hereby other than Eastdil Secured ("**Eastdil**"). Sears shall pay Eastdil in accordance with Section 10.3(a) of the PSA. Sears agrees to indemnify, protect, defend and hold Landlord harmless from and against all claims resulting from Sears' breach of the foregoing representation.

(b)  Landlord represents and warrants to Sears that neither Landlord nor any Affiliate of Landlord has dealt with any broker, salesman, finder or consultant with respect to this Lease or the transactions contemplated hereby. Landlord agrees to indemnify, protect, defend and hold Sears harmless from and against all claims resulting from Landlord's breach of the foregoing representation.

34.  **Confidentiality.**  Sears and Landlord agree to keep and hold this Lease and the terms and conditions contained herein strictly confidential and neither Sears nor Landlord will disclose or permit any other Person to disclose the terms and conditions of this Lease to any other Person without the prior written authorization of the other party. Notwithstanding the foregoing, Sears and Landlord may disclose this Lease and/or the terms and conditions hereof to Sears' and Landlord's respective agents, consultants, affiliates, directors, accountants, advisors, partners, employees and legal counsel ("**Representatives**") provided that such Representatives have a

legitimate need to know and agree to keep the terms and conditions strictly confidential in accordance with this <u>Section 35</u>.

35.   **<u>Additional State-Specific Provisions</u>**. The provisions and/or remedies which are set forth on the attached **<u>Exhibit D</u>** shall be deemed a part of and included within the terms and conditions of this Lease.

36.   **<u>Prepaid Rent</u>**. On the Effective Date, Sears shall provide Landlord with an amount equal to $3,720,035.10 (i.e., twelve (12) months of Monthly Fixed Rent otherwise due during months seven (7) through eighteen (18) of the Term) (the "**<u>Prepaid Rent</u>**"), as prepaid rent due under this Lease for months seven (7) through eighteen (18) of the Term. Provided Sears is not then in default under this Lease beyond any applicable notice or cure period, Landlord shall apply the Prepaid Rent to Sears' obligation to pay Monthly Fixed Rent as and when due until the entire amount of the Prepaid Rent has been exhausted; provided, however, if this Lease is terminated due to a Landlord default, casualty, condemnation, or the early termination rights described in <u>Section 3</u> above, then Landlord shall promptly return the unapplied portion of the Prepaid Rent to Sears.

**[Signatures appear on the following pages]**

**IN WITNESS WHEREOF**, Landlord and Sears have executed and delivered this Lease to each other as of the Effective Date.

**SEARS:**

**SEARS HOLDINGS CORPORATION,**
a Delaware corporation

By: _____

Name: Joseph F. Jordan

Title: Vice President + Controller

LANDLORD:

**1055 HANOVER, LLC,**
a Delaware limited liability company

By:   1055 Hanover Holding, LLC,
      a Delaware limited liability company,
      its sole Member and Manager

      By:   LBA Fund VI-MM Industrial, LLC,
            a Delaware limited liability company,
            its sole Member and Manager

            By:_____
            Name:_____ ~~Steve Layton~~
            Title:_____ ~~Authorized Signatory~~

[SIGNATURE PAGE TO LEASE (1055 HANOVER STREET, WILKES BARRE, PA)]

## EXHIBIT A

### Legal Description

All that certain piece or parcel of land situate partly in the Township of Hanover, partly in the Borough of Sugar Notch, and partly in the Borough of Warrior Run, County of Luzerne, Commonwealth of Pennsylvania, bounded and described as follows:

Beginning at a point in the Northeasterly right of way line of a 40.00 foot wide road known as Front Street in the Township of Hanover, said point being the Southerly most corner of lands now or formerly of Edward and Catherine Halicki; thence along lands of Halicki, Linkiewicz, Ozmina, Duffy, Pascoe, and Wachs North 64° 56' 25" East 541.67 feet to a point; thence along lands of Wachs, Carr, Stuart and Trudnak along a curve to the left having a radius of 421.73 feet, an arc length of 561.07 feet, a chord of North 15° 56' 57" East 520.60 feet to a point; thence along lands of Trudnak North 22° 09' 49" West 317.00 feet to a point; thence continuing along same South 66° 47' 23" West 194.34 feet to a point in the Northeasterly right of way line of a 50.00 foot wide road known as South Street; thence along South Street North 25° 06' 54" West 111.97 feet to a point; *thence continuing along same North 14° 12' 06" East 373.92 feet to a point in line of lands now or formerly of John and Isadore Berk*; thence along Berk South 71° 26' 32" East 199.29 feet to a point; thence continuing along same North 70° 21' 44" East 431.32 feet to a point in line of lands now or formerly of UGI Corporation; thence along said UGI Corporation lands South 16° 08' 32" East 152.74 feet to a point; thence through same North 71° 37' 32" East 50.03 feet to a point; thence continuing along same North 16° 08' 32" West 239.16 feet to a point in line of lands now or formerly of Henry A. Trudnak; thence along Trudnak North 58° 11' 10" East 444.81 feet to a point; thence along same and along lands of Grandview Acres Subdivision North 67° 35' 10" East 446.00 feet to a point; thence along Grandview Acres Subdivision North 72° 00' 10" East 332.00 feet to a point; thence South 36° 29' 50" East 1720.41 feet to a point in the Westerly right of way line of a 100.00 foot wide road known as Hanover Street; thence along Hanover Street the following eight courses and distances: South 04° 01' 37" West 272.67 feet to a point; thence along a curve to the right having a radius of 600.00 feet, an arc length of 624.74 feet, a chord of South 33° 51' 22" West 596.90 feet to a point; thence South 63° 41' 07" West 1104.04 feet to a point; thence along a curve to the right having a radius of 4950.00 feet, an arc length of 485.44 feet, a chord of South 66° 29' 41" West 485.24 feet to a point; thence South 69° 18' 15" West 362.39 feet to a point; thence along a curve to the right having a radius of 5347.23 feet, an arc length of 221.06 feet, a chord of South 74° 30' 14" West 221.04 feet to a point; thence South 75° 41' 18" West 121.17 feet to a point; thence South 80° 44' 43" West 55.69 feet to a point in the Northeasterly right of way line of a 30 foot wide unnamed alley; thence along said alley North 26° 06' 39" West 650.37 feet to a point in line of lands now or formerly of Warrior Run-Askam Community Service Association; thence along Warrior Run Askam Community Service Association North 63° 41' 00" East 369.95 feet to a point; thence continuing along same North 26° 19' 00" West 330.00 feet to a point; thence continuing along same South 52° 22' 00" West 387.53 feet to a point in line of lands now or formerly of Dominic and Geraldine Wegrzynowicz; thence along Wegrzynowicz North 26° 19' 00" West 188.37 feet to a point; thence continuing along same South 64° 56' 25" West 120.03 feet to a point in the Northeasterly right of way line of aforementioned Front Street; thence along Front Street North 25° 03' 35" West 40.00 feet to the point of beginning.

EXHIBIT A
-1-

Being designated as the following Tax Parcel Nos.:

Portion in Warrior Run Borough
Plate No. 62-C-3-1-R1-D1-1
PIN No. 62-J8S5-001-001-000

Portion in Hanover Township
Plate No. 25-C-2-D11-1-D20-D1-R6
PIN No. 25-J8S5-001-001-000

Portion in Sugar Notch Borough
Plate No. 60-C-2-D1-R1-D65-D1
PIN No. 60-J8S5-001-001-000

Being the same property that was conveyed by The Greater Wilkes-Barre Industrial Fund, Inc. to Terminal Freight Handling Company by deed dated July 24, 1992 and recorded in Deed Book 2427, page 9.

**Property Identification Number(s):** 62-J8S5-001-001-000, 25-J8S5-001-001-000, and 60-J8S5-001-001-000

## EXHIBIT B

The **"Premises"** means the entirety of the Property together with all improvements located thereon.

**EXHIBIT C**
**[RESERVED]**

781155.06/WLA
377042-00001/3-10-18/slslslslw

EXHIBIT C
-1-

**EXHIBIT D**
**State Specific Provisions**

None.

## SCHEDULE 1
## Landlord Retained Leases

None.

**SCHEDULE 2**
**Annual Fixed Rent**

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1  4\5 - 4\9 1ʳ | $3,665,059.20 | $305,421.60 |
| 2  5\11\ - 4\30\20 | $3,775,010.98 | $314,584.25 |
| 3 | $3,888,261.31 | $324,021.78 |
| 4 | $4,004,909.14 | $333,742.43 |
| 5 | $4,125,056.42 | $343,754.70 |
| 6 | $4,248,808.11 | $354,067.34 |
| 7 | $4,376,272.35 | $364,689.36 |
| 8 | $4,507,560.53 | $375,630.04 |
| 9 | $4,642,787.34 | $386,898.95 |
| 10 | $4,782,070.96 | $398,505.91 |

## SCHEDULE 3
## DEFERRED MAINTENANCE WORK

- HVAC - replace older DX split systems serving the office areas with comparable units as determined by Landlord – 10 tons

- Fire Life Safety - test all ESFR sprinkler heads in accordance with NFPA 25 requirements, which consists of a total of 105 heads.

- Other - construct new foundations for 6 light poles in a location reasonably determined by Landlord, and relocate the 6 existing light poles that are out of plumb on the east side of the Property, to the new foundations.

## **EXHIBIT 2**

**IMESON LEASE**

# LEASE

## BY AND BETWEEN

### SEARS HOLDINGS CORPORATION, as tenant

### AND

### 1 IMESON PARK BLVD, LLC, as landlord

Dated as of April **5**, 2018

Property:
1 Imeson Park Boulevard, Jacksonville, FL

## LEASE

THIS LEASE (this "**Lease**") is made as of the __ day of April, 2018 ("**Effective Date**"), between **1 IMESON PARK BLVD, LLC**, a Delaware limited liability company, having an office at 3347 Michelson Drive, Suite 200 Irvine, California 92612, ("**Landlord**") and **SEARS HOLDINGS CORPORATION**, a Delaware corporation, having an office at 3333 Beverly Road, Dept. 824RE, Hoffman Estates, Illinois 60179 ("**Sears**").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement dated as of February 8, 2018, between Innovel Solutions, Inc. ("**Seller**"), as seller, and Landlord, (as assignee from LBA Realty LLC, a Delaware limited liability company) as buyer (as amended and assigned, the "**PSA**"), Seller agreed to sell to Landlord, and Landlord agreed to purchase from Seller the land more particularly described on **Exhibit A** attached hereto and the other property described in the PSA (collectively, the "**Property**");

**WHEREAS**, as a condition to the closing pursuant to the PSA (the "**Closing**"), immediately following the sale of the Property by Seller to Landlord, Landlord is required to lease to Sears, and Sears is required to lease from Landlord, the Premises (as defined below) pursuant to the terms and conditions of this Lease; and

**WHEREAS**, the Closing under the PSA occurred on the Effective Date and Sears and Landlord wish to enter into this Lease to complete the transaction.

**NOW, THEREFORE,** Sears and Landlord agree as follows:

1.    **Demise**. Landlord hereby leases to Sears, and Sears hereby leases from Landlord, the Premises for the Term. The "**Premises**" shall be defined as the premises described on **Exhibit B** attached hereto. Sears shall also have the right to use, in common with all other tenants and occupants of the Property on a non-exclusive basis, all parking, access and common areas useful in connection with the Property in a manner substantially similar to the manner in which same have been used prior to the date hereof, to the extent Landlord possesses or has the right to such rights. The Premises shall not include, and Landlord shall retain the sole and exclusive rights in, the leases listed on the attached **Schedule 1** (collectively, the "**Landlord Retained Leases**"). Landlord shall not amend or modify the Landlord Retained Leases without the prior written consent of Sears (which consent shall not be unreasonably withheld, and shall be granted or withheld within thirty (30) days of request), except only to the extent that neither Sears' operations nor Sears' rights hereunder are materially adversely affected by such amendment or modification. Without limiting the foregoing, no modification or amendment shall be made to any Landlord Retained Lease to increase the space used under such Landlord Retained Lease or which would result in any material increased cost to Sears without the prior written consent of Sears.

781155.06/WLA
377042-000013-30-18/sb/ejw

2.    **Term**.

(a)    The term of this Lease (the "**Term**") shall commence on the Effective Date and shall expire at midnight on the last day of the tenth (10th) Lease Year, unless sooner terminated as provided in this Lease.

(b)    If the date otherwise scheduled for termination or expiration of this Lease is not a Business Day, the Termination Date shall be on the first Business Day thereafter.  A "**Business Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in the jurisdiction in which the Premises is located.  A "**Lease Year**" means each successive twelve (12) calendar month period commencing on the first day of a calendar month.  The first Lease Year shall be the twelve (12) month period commencing on the first day of the calendar month immediately succeeding the month in which the Term of this Lease commences plus any partial calendar month during the calendar month in which the Term of this Lease commences.

3.    **Early Termination; Surrender of Possession**.

(a)    **Early Termination By Landlord**.  In addition to any early termination of this Lease that may arise under any other section of this Lease, Landlord may elect to terminate this Lease prior to the expiration of the Term, but only if such termination is effective after the last day of the sixtieth (60th) full calendar month of the Term; provided, that as a condition precedent to such termination, Landlord shall provide not less than nine (9) months' prior written notice of termination ("**Landlord Termination Notice**") to Sears.  The Landlord Termination Notice shall indicate the date of the termination of this Lease, which must be a Business Day that does not occur between November 15 of a calendar year and January 15 of the next following calendar year and which must be after the last day of the sixtieth (60th) full calendar month of the Term.

(b)    **Surrender of Possession**.  Upon the first to occur of (i) the expiration of the Term, (ii) any sooner termination of this Lease pursuant to any other section of this Lease, or (iii) any earlier date as noted in a validly delivered Landlord Termination Notice or Sears Termination Notice, as applicable (the first of such dates being the "**Termination Date**"), Sears shall surrender possession of the Premises in its "AS-IS," "WHERE-IS" and "WITH ALL FAULTS" condition, free of all subtenants, licensees, leases, subleases, concessionaires and other occupants claiming by, through or under Sears, and without any obligation by Sears, except as provided in the following sentence, to remove any fixtures, furnishings or equipment or other personal property.  On or prior to the Termination Date, Sears shall remove any or all of Sears' furnishings, movable equipment, merchandise, inventory and other personal property and may (but shall not be required to) remove fixtures (including, without limitation, permanently affixed fixtures, such as racking and conveyor systems installed prior to the Effective Date) (all of the foregoing items noted in this sentence, collectively, "**Sears' Property**") and any alterations or improvements required to be removed by Sears pursuant to Section 5(a) below, including repairing any damage caused by such removal, ordinary wear and tear excepted.  If Sears fails to remove any Sears' Property that is required to be removed, any of the same remaining after the Termination Date may be removed by Landlord at Sears' expense or retained by Landlord for its account.

4.    **Rent**.

(a)     As consideration for this Lease, Sears shall pay to Landlord annual fixed rent ("**Annual Fixed Rent**") during each Lease Year in the aggregate amounts set forth on **Schedule 2** attached hereto. The Annual Fixed Rent then in effect shall be payable in equal monthly installments ("**Monthly Fixed Rent**") in advance on or prior to the fifth (5th) day of each month. Monthly Fixed Rent shall be prorated on a per diem basis for any portion of a month.

(b)     As "**Additional Rent**" Sears shall also pay during the Term, in equal monthly installments, an amount equal to Landlord's insurance premiums for coverages applicable to the Property that Landlord purchases pursuant to this Lease (provided such insurance premiums, and the insurance coverages (including deductibles) purchased therewith are commercially reasonable and consistent with the types and amounts of coverages that would be purchased by prudent owners of properties similar in type to and in the general vicinity of the Property). Sears shall also pay any amounts due on a monthly basis for Required CapEx in accordance with Section 8(c)(i) below.

(c)     Sears shall also pay directly to the relevant authority as and when due, Taxes and, upon request by Landlord, shall provide Landlord with reasonable evidence that the same have been paid. For purposes hereof, "**Taxes**" shall mean all taxes and impositions relating to the ownership, leasing and operation of the Property, or any portion thereof, including the land, but excluding any excess profits taxes, franchise taxes, gift taxes, inheritance and succession taxes, estate taxes, documentary transfer taxes, federal or state income taxes, corporate, capital stock or capital gains taxes, penalties incurred as a result of Landlord's failure to pay taxes or to file any tax or informational returns and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Property).

(d)     Landlord shall give prompt notice to Sears of all Taxes and insurance premiums, payable by Sears hereunder of which Landlord at any time has knowledge and shall send copies of all bills and notices received by Landlord to Sears. Promptly after receipt of such notice of the actual amount of Additional Rent, such amount will be adjusted between Landlord and Sears in cash. Provided that Sears is not then in default under this Lease (beyond applicable notice and cure periods), Sears reserves the right to audit the books and records of Landlord with respect to any component of Additional Rent within one (1) year of the expiration of the year to which such Additional Rent relates.

(e)     If the Termination Date occurs on any day other than the last day of a calendar month, Sears will be entitled to a refund in an amount equal to Monthly Fixed Rent and Additional Rent theretofore paid under this Lease allocable on a per-diem basis to the remainder of the month.

(f)     The parties acknowledge and agree that Sears shall pay for all of the operating costs and expenses (such as, but not limited to, utility costs and phone service) in connection with Sears' use and occupancy of the Premises during the Term, in accordance with its customary practices, subject to Section 8 and Section 4, and except (i) for costs, expenses and damages resulting from the negligence or willful misconduct by Landlord or its agents, employees or contractors, but subject to the terms of Section 23(b) below, and (ii) as otherwise expressly set forth herein.

(g)      Annual Fixed Rent, Monthly Fixed Rent and Additional Rent shall be collectively referred to herein as "**Rent**."

(h)      For the avoidance of doubt, but subject to <u>Section 4</u>, Sears shall be solely responsible for payment of all Taxes from the beginning of the current tax year up to and including the Effective Date. Subject to <u>Section 4</u>, all Taxes applicable to the last year of the Term shall be prorated between the parties on a per diem basis based on the most recent and available tax bill and adjusted in cash once actual taxes are known. Landlord shall give prompt notice to Sears of all Taxes payable by Sears hereunder of which Landlord at any time has knowledge. Landlord shall use its reasonable efforts to obtain the cooperation of all taxing authorities to send all bills and notices in respect of the Property directly to Sears.

(i)      Sears may, at its own expense, contest or cause to be contested by appropriate legal proceedings conducted in good faith and with due diligence, any Taxes (including penalties and interest) upon or against the Property or any part thereof, including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that (i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings; (ii) no default under this Lease has occurred and is continuing; (iii) if and to the extent required by the applicable taxing authority and/or Landlord, Sears posts a bond or takes other steps acceptable to such taxing authority and/or Landlord that removes such lien or stays enforcement thereof; (iv) Sears shall promptly provide Landlord with copies of all notices received or delivered by Sears and filings made by Sears in connection with such proceeding; and (v) upon termination of such proceedings, it shall be the obligation of Sears to pay the amount of any such tax and assessment or part thereof as finally determined in such proceedings (or, if applicable, Sears will be entitled to any refund resulting therefore), the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith. Landlord shall, at the request of Sears, execute or join in the execution of any instruments or documents necessary in connection with such contest or proceedings, but Landlord shall incur no cost or obligation thereby.

(j)      Sears shall pay directly to the utility company(ies), the cost of all utilities provided to the Premises during the Term.

(k)      In light of the fact that Sears is continuing (i) in occupancy following the Closing, and (ii) to control the Service Contracts, except as set forth in the PSA, Sears and Landlord have not prorated common area maintenance reimbursements or payments under any Ancillary Rights and Agreements, expenses under Service Contracts, utilities and other customary real property prorations and adjustments as of the Closing.

5.      **Alterations; "Going out of Business Sale"; Signage.**

(a)      Except as otherwise provided herein, and subject to the rights of tenants under any Landlord Retained Leases, without first obtaining Landlord's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), Sears shall not make or cause to be made any alterations to the building structure or building systems or any other material alterations or install any additional permanent fixtures to the Premises. Notwithstanding the

preceding sentence, Sears (and any of its subtenants, licensees or other occupants) shall not be required to obtain any consent from Landlord for (1) any minor or non-structural alterations to the Premises, (2) placing temporary signs on the Property in connection with its store-closing operations or (3) any non-structural alterations to the Premises in connection with any Necessary Curtailments, or any other reduction in business operations or reduction in utilizing space within the Premises that do not affect the exterior of the improvements or the building systems, or disturb any hazardous materials. "**Necessary Curtailments**" means alterations, ordinary repairs, Casualty, customary acts or events of force majeure, and events beyond the reasonable control of Sears. Notwithstanding the foregoing, Sears, at its expense, may at any time and from time to time make alterations and/or additions to the Premises, subject to Landlord's prior written consent (to the extent required pursuant to this Section 5) not to be unreasonably withheld, conditioned or delayed, provided that (A) the market value of the Premises shall not be reduced or its usefulness impaired, (B) the work shall be done expeditiously and in a good and workmanlike manner, (C) Sears shall comply with all legal requirements applicable to the work and (D) Sears shall promptly pay all costs and expenses and discharge any and all liens arising in connection with the work in accordance with the terms hereof. Notwithstanding the foregoing, Sears, at its expense, may install or assemble or place on the Premises, and remove and substitute (and repair any damage caused by such removal and substitution), any items of machinery, equipment, furniture, furnishings, trade fixtures or other Sears' Property, including, but not limited to, all conveyer and material handling systems and related equipment, used or useful in Sears' business; provided, that Sears shall be obligated to remove the same on or prior to the end of the Term in accordance with Section 3(c) unless Landlord shall have consented, at the time of installation, to the same remaining in place following the end of the Term.

(b)    Notwithstanding any provision herein to the contrary, but subject to the provisions hereof, Sears shall have the right to conduct a "going out of business sale" to be completed during the one hundred twenty (120) day period prior to the expiration of the Term or earlier termination of this Lease as provided herein and to cease store operations and to remove Sears' Property and prepare for the turnover of possession of the Premises to Landlord pursuant to the provisions of this Lease. With respect to a Sears "going out of business sale" and during the one hundred twenty (120) day period provided above, (i) Sears shall not place or allow the placement of any signage (including, but not limited to, banners, posters, placards and/or stand-alone signs, collectively "**GOB Signage**") on the exterior of the improvements (or on the interior of the improvements if such GOB Signage is visible from the exterior of the improvements) that contains the words/phrases "going out of business", "everything must go", "store closing", "liquidation sale", "complete liquidation" or phrases of similar wording and/or intent; provided that Sears may place GOB Signage with the words "Sears Store Closing" or "Sears Store Closing Sale" on the exterior of the improvements (or on the interior of the improvements which is visible from the exterior of the improvements) so long as such GOB Signage is professionally prepared and installed, and of a reasonable size; (ii) Sears' GOB Signage may include discount pricing information; and (iii) Sears shall not place or allow the placement of any GOB Signage on the exterior surface of the improvements (except as provided above) or within the common areas of the Property.

(c)    Sears shall have the option to erect and maintain, subject to applicable legal requirements and matters of title to which this Lease is subordinate and Ancillary Rights and Agreements, at its sole cost and expense, upon any portion of the Property or improvements, signs

of such height and other dimensions bearing such legend or inscription as Sears shall determine, and which are generally consistent in size and quantity with the signs in existence as of the Effective Date, and consistent with the nature and quality of the Property.

6.   **Use; Operation**.

(a)   Sears shall not have any obligation to continuously operate or use or conduct business in or on any portion of the Premises. Sears may use the Premises, if Sears operates at all, solely for the operation of a warehouse and distribution facility, and for purposes in connection with or incidental to the cessation of Sears' operations on the Premises as such, including, without limitation, the sale of Sears' Property located at the Premises. Sears shall, at Sears' sole cost and expense, use and operate the Premises, if Sears operates at all, in compliance with law; provided, however, that Sears shall not be obligated to perform any capital expenditures or structural improvements necessary in order to comply with law, except to the extent that such capital expenditure or structural improvements are necessitated by (subject in all respects to Sears' rights and determinations as provided in Section 8(c)(i) below) (a) any laws in effect and applicable to the Premises prior to the Closing Date, (b) any use of the Premises by Sears that is not substantially consistent with Sears' use as a warehouse and distribution facility, or (c) any alterations or improvements made by Sears to the Premises.

(b)   Without limiting the foregoing, Sears will continue to enjoy the benefit of all existing easements, parking agreements, rights of access and ingress, and all other rights and benefits as it currently enjoys (including under all applicable REAs and supplemental agreements, if any) with respect to the Property (all of the foregoing, collectively, "**Ancillary Rights and Agreements**"), and in furtherance thereof, Landlord agrees to enforce (and cause its Affiliates to enforce) all such Ancillary Rights and Agreements (excluding operating covenants) for the benefit of Sears. Sears agrees to continue to comply with the non-monetary provisions (if any) of the Ancillary Rights and Agreements that are applicable to the Premises (which, for the avoidance of doubt, does not include property that is subject to a Landlord Retained Lease) in accordance with its past practices in the ordinary course of business. Landlord shall not terminate, amend or modify the Ancillary Rights and Agreements without Sears' consent (which consent shall not be unreasonably withheld, and shall be granted or withheld within thirty (30) days of request).

7.   **Access and Cooperation**. Upon not less than one (1) Business Day's prior notice to Sears, Landlord and its representatives shall have access to the Premises for purposes of visual inspections, and upon not less than five (5) Business Days prior notice to perform inspections and tests of the Property, in each case during normal business hours; provided, however, that in emergency circumstances Landlord and its representatives may have immediate access to the Premises at any time after making all reasonable attempts to contact Sears, but otherwise without the necessity of prior notice. In connection with any such access or entry, and in connection with any access or entry by or on behalf of Landlord to perform any work permitted or required to be performed by Landlord as provided herein, Landlord and its representatives shall (a) not unreasonably interfere with or disturb Sears' or any subtenant's, licensee's or other occupant's business operations at the Premises, and (b) promptly restore or repair any damage occasioned by such access or entry. In addition, notwithstanding anything to the contrary contained herein, and without limiting any other provision herein, in connection with any work to be performed by Landlord as required or permitted herein, (i) Landlord shall notify Sears within a reasonable time

prior to the commencement of such work and afford Sears the opportunity to have a representative present during the performance of such work, (ii) Landlord shall use commercially reasonable efforts to coordinate the timing, scope and location of such work with Sears, (iii) Landlord shall perform such work, or cause such work to be performed, expeditiously and in a good and workman like manner using industry standard methods, materials and finishes as reasonably selected by Landlord, (iv) all architects, engineers and other construction professionals engaged by or on behalf of Landlord shall be experienced, financially responsible and duly licensed in the jurisdiction in which the Property is located and charge competitive and otherwise reasonable rates, (v) all contractors engaged by or on behalf of Landlord shall be bondable, (vi) Landlord and its agents shall comply with good safety and security practices in performing the work and shall keep the Premises free from accumulations of waste and/or rubbish caused by or in connection with the work, (vii) Landlord shall, and shall cause its agents, to comply with all applicable laws in connection with the work and Landlord shall obtain all permits and authorizations necessary to conduct the work and (viii) Landlord shall maintain and cause its construction professionals to maintain customary insurance coverage with customary limits with respect to any work performed by or on behalf of Landlord. Each party shall indemnify, protect, defend and hold harmless the other against Loss resulting from the work performed (or required to be performed) by the indemnifying party (including, without limitation, any Loss resulting from the failure of the indemnifying party to perform the work as and when required hereunder), which indemnity shall survive the Termination Date.

8.    **Services and Repairs**.

(a)    Subject to the provisions of this Section 8 and the other terms and conditions of this Lease, Sears shall accept the Premises and Property in its existing condition as of the Effective Date, "as is," "where is," and "with all faults" and without any written or verbal representations or warranties whatsoever, whether express or implied, and except for any surviving provisions of the PSA and any ancillary documents executed in connection therewith, for the period of such survival.

(b)    Subject to the foregoing and the following provisions of this Section 8 and the other terms and conditions of this Lease, Landlord shall have no obligation to supply any services or make any ordinary repairs to the Premises or Property, the parties expressly intending that subject to the further provisions of this Section 8 and the other terms and conditions of this Lease, Sears' current arrangements for all other services and general maintenance and ordinary repairs shall continue at Sears' election unaffected during the Term (and Landlord shall not interfere with same).

(c)    Sears may, but shall have no obligation to, make capital expenditures as Sears deems necessary or desirable. Subject to the provisions hereinafter set forth and Section 5, Sears and not Landlord shall be responsible for all ordinary repair and maintenance of the Premises required to keep the Premises in good condition and repair (as reasonably determined by Landlord and Sears), and in any event, shall include all repair and maintenance required to comply with applicable law and remedy any condition that creates a health and safety concern, or could reasonably be expected to result in material damage to the Premises (the "**Maintenance Standard**"), however, Landlord, and not Sears shall be responsible for performing any immediate required repair and maintenance to the Premises (i.e., to remedy a condition or circumstance that

exists as of the Effective Date), and Sears shall reimburse Landlord for any such work completed within the Deferred Maintenance Period (as the same may be extended as provided herein), as additional rent, but Sears total out-of-pocket costs for such work shall not exceed the Deferred Maintenance Amount (as that term is defined below) in the aggregate, and further provided, however, the parties' obligations for performing and paying for capital expenditures is further provided below. For the avoidance of doubt, the immediate required repair and maintenance work described in the preceding sentence is separate from the Deferred Maintenance Work and Required CapEx and Sears' *total costs in connection with the Deferred Maintenance Work and such immediate required repair and maintenance shall never exceed the Deferred Maintenance Amount.*

(i)     Subject to the following terms of this <u>Section 8(c)(i)</u>, Sears' obligation to maintain the Premises in accordance with the Maintenance Standard does not include the obligation to perform any capital expenditures, but includes certain obligations to pay for such capital expenditures as set forth below.

(A)     Notwithstanding anything to the contrary set forth herein, as of the date hereof, certain work (collectively, the **"Deferred Maintenance Work"**) more particularly described on <u>**Schedule 3**</u> attached hereto, has not yet been performed by Sears, but is required to be performed in order to satisfy the Maintenance Standard. The parties agree that, Landlord, not Sears, shall be responsible for performing all of the Deferred Maintenance Work, at Sears' sole cost and expense, except as set forth below, and that Landlord shall substantially complete such work within twelve (12) months of the Effective Date (the **"Deferred Maintenance Period"**); provided that the Deferred Maintenance Period shall be extended on a day for day basis for each day Landlord is delayed in performing or completing the Deferred Maintenance Work as the result of any action or inaction by Sears or any of Sears' agents resulting from the requirements described in the last sentence of this paragraph, and any event force majeure, so long as Landlord has notified Sears of such event of force majeure or action or inaction by Sears or its agents that is causing such delay. The cost of the Deferred Maintenance Work in the aggregate amount of Eight Hundred Twenty Seven Thousand Dollars ($827,000.00) (the **"Deferred Maintenance Amount"**), shall be deducted from the "Purchase Price" (as defined in the PSA) and credited to Landlord at Closing. Landlord shall be responsible for all costs of the Deferred Maintenance Work in excess of the Deferred Maintenance Amount, and shall promptly return to Sears any Deferred Maintenance Amount which has not been used on or before the expiration of the Deferred Maintenance Period (as the same may be extended as provided herein). Landlord shall provide Sears with copies of all invoices associated with the Deferred Maintenance Work. Sears reserves the right to audit the books and records of Landlord with respect to the Deferred Maintenance Work for a period of one (1) year after the expiration of the Deferred Maintenance Period (as the same may be extended as provided herein). Without limiting any other provision hereof, Landlord shall (i) use commercially reasonable efforts to coordinate the timing, scope and location of the performance of the Deferred Maintenance Work with Sears, (ii) perform the Deferred Maintenance Work in a manner which does not unreasonably interfere with Sears' use and enjoyment of the Premises (or the use and enjoyment of the Premises by any subtenants, licensees or customers of Sears), and (ii) notify Sears within a reasonable time prior to the commencement of any Deferred Maintenance Work and afford Sears the opportunity to have a representative present during the performance of the same, provided that any delay in the performance or completion of the Deferred Maintenance Work resulting directly or indirectly from the foregoing requirements shall extend the Deferred Maintenance Period as (and subject to the notice) indicated above.

(B)    In the event that a capital expenditure, besides the Deferred Maintenance Work, is appropriate or necessary to maintain the Premises consistent with the Maintenance Standard, as reasonably determined by Landlord or Sears (a "**Required CapEx**"), and the aggregate cost of such Required CapEx is reasonably estimated by Sears, together with all previous Required CapEx, to exceed $350,000, exclusive of any amounts paid by Sears for ordinary repairs and maintenance as provided in Section 8(b) (the "**Required CapEx Max**"), Sears does not have any requirement to perform or fund such Required CapEx, but Sears shall notify Landlord of the necessity and the cost (or reasonably estimated cost) of such Required CapEx. Landlord shall have the opportunity for a period of ten (10) business days after receipt of such notice from Sears to notify Sears that Landlord irrevocably commits to fund the amount of such Required CapEx in excess of the Required CapEx Max. If Landlord timely commits to fund such Required CapEx in excess of the Required CapEx Max, Sears shall make any such Required CapEx (subject to the terms and provisions of this Lease and subject to reimbursement by Landlord as set forth above); provided that Sears shall reimburse Landlord for the amortized cost of such Required CapEx funded by Landlord (amortized over the useful life of the Required CapEx) on a monthly basis over the remainder of the Term in the event that the cost of such particular Required CapEx in excess of the Required CapEx Max funded by Landlord exceeds Two Hundred and Fifty Thousand Dollars ($250,000.00), and provided that Sears shall have no responsibility to reimburse Landlord for such amortized costs during the first two (2) years of the Term unless such Required CapEx in excess of the Required CapEx Max is necessary to address significant health and safety concerns in or on the Premises and Sears shall have no obligation to reimburse Landlord for the amortized costs of any Required CapEx that costs Two Hundred and Fifty Thousand Dollars ($250,000.00) or less. Alternatively, Landlord may elect to instead perform the Required CapEx in excess of the Required CapEx Max on behalf of Sears, at Landlord's sole cost and expense, subject to the foregoing reimbursement of annual amortized costs. If Landlord elects to perform the Required CapEx as provided above, Landlord shall do so on a timely basis and in consultation with Sears. If Landlord does not timely irrevocably commit to fund the amount of such Required CapEx or to perform the Required CapEx, in each case in excess of the Required CapEx Max, and the failure to perform the Required CapEx would create a health and safety concern, cause the Premises to fail to comply with applicable laws, or otherwise affect Sears ability to conduct business from the Premises, then Sears shall have the right to send a Sears Notice and follow the procedures set forth in Section 10(b).

(i)    Except as expressly set forth above and elsewhere in this Lease, Sears shall have no obligation to make any repairs or replacements or capital expenditures of whatever nature during the Term (except as and to the extent necessitated by Sears' failure to perform general maintenance with respect to the Premises in accordance with paragraph (c) above), but Sears may do so at any time at its election. Sears may continue to exercise and enforce exclusively any and all rights of the owner or landlord under the Service Contracts (including, without limitation, with respect to maintenance and upkeep of the Premises), and Landlord agrees to reasonably cooperate with Sears at no cost to Landlord in connection therewith.

9.    **Insurance; Casualty**.

(a)    Sears shall maintain all personal property and liability insurance programs presently in effect or as replaced by Sears from time to time in accordance with its general corporate policies throughout the Term; provided, however, at a minimum, Sears shall carry

(i) commercial general liability insurance with limits of at least $15,000,000 per occurrence, (ii) commercial automobile liability coverage, and (iii) worker's compensation or other similar insurance pursuant to all applicable state and local statutes and regulations. Such policies shall name "Sears Holdings Corporation" as named insured thereunder and shall name Landlord and, at Landlord's request, such other persons or entities of which Sears has been informed in writing, as additional insureds thereunder, all as their respective interests may appear. Landlord shall maintain a "Lessor's Risk" policy of liability insurance, all-risk property damage insurance covering the Premises and other building improvements on the Property (including, but not limited to, earthquake and/or flood insurance), pollution legal liability coverage, and such other types and amounts of coverage that commercially reasonable and consistent with the types and amounts of coverages that would be purchased by prudent owners of properties similar in type to and in the general vicinity of the Property, and Sears shall pay to Landlord the costs of insurance maintained by Landlord in accordance with this <u>Section 9(a)</u>, as set forth in <u>Section 4</u> above and this <u>Section 9(a)</u>. In addition, Sears shall reimburse Landlord as additional rent for any property insurance deductibles incurred during the Term, not to exceed $15,000 per claim. Landlord may maintain the foregoing coverages pursuant to a blanket and/or umbrella policy. Upon request from Landlord, Sears shall provide certificates of insurance evidencing that Sears is then satisfying the insurance requirements set forth above. Upon request from Sears, Landlord shall provide certificates of insurance evidencing that Landlord is then satisfying the insurance requirements set forth in this Lease.

(b)     This Lease shall terminate at the election of Sears upon the occurrence of a fire or other casualty ("**Casualty**") which results in material damage to the Premises (i.e., the portion of the Premises that is destroyed or damaged is twenty-five percent (25%) or more of the heated floor area of the Premises or the portion of the Premises that is destroyed or damaged materially affects Sears' use and occupancy of the Premises, with an appropriate prorated refund to Sears on a per-diem basis of all prepaid Monthly Fixed Rent and Additional Rent. If this Lease is not terminated pursuant to the preceding sentence, then in the event of a Casualty, all Monthly Fixed Rent and Additional Rent with respect to the portion of the heated floor area of the Premises which is affected by the Casualty, not usable and not actually used by Sears shall be abated on a per-square-foot basis. If this Lease is terminated as provided herein, Sears, at Sears' election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Sears), for the purpose of winding down its business operations and removing any or all Sears' Property at its election from the Premises, but Sears shall pay Rent at the rate set forth herein during the Lease Year in which the Casualty occurs for any period beyond such date of termination that Sears remains in possession of the Property (such Rent with respect to the portion of the Premises which is damaged shall be abated on a per-square-foot basis). To the extent that the Lease is terminated pursuant to this paragraph, neither Sears nor Landlord shall be obligated to make any repairs or restorations in the event of damage to the Premises resulting from a Casualty. If this Lease is not terminated pursuant to the preceding sentence, then in the event of a Casualty, Sears shall repair and restore the Sears' personal property to the extent deemed necessary or desirable by Sears in Sears sole discretion, but Sears shall only be obligated to repair and restore the Premises to the extent of proceeds of insurance made available by Landlord or to the extent Landlord pays all costs and expenses of such restoration. Notwithstanding the foregoing, this Lease shall not terminate as the result of any Casualty that occurred prior to the Effective Date that did not result in Landlord (or its affiliate which is a party to the PSA) having a right to terminate the PSA.

(c)     If Landlord shall be advised by a condemning authority or otherwise has knowledge of a proposed condemnation or other taking of the Property (or a portion thereof), then Landlord shall promptly give notice thereof to Sears. Upon any actual exercise by any governmental power (by legal proceedings or otherwise), by any public or quasi-public authority or by any other Person having the right of eminent domain or a voluntary sale or transfer by Landlord to any of the foregoing either under the threat of exercise of eminent domain or while legal proceedings for condemnation are pending with respect to a material portion of the Premises (i.e., twenty-five percent (25%) or more of the heated floor area of the Premises or the portion of Property taken materially affects the use and occupancy of the Premises) (collectively, a "**Condemnation Action**"), this Lease shall automatically terminate, except as provided below, as of the date on which title to the property subject to the Condemnation Action is vested in the condemnor. Sears, at Sears' election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Sears) after Sears receives notice of a Condemnation Action (but in no event later than the date of the actual Condemnation Action) during which to wind down its business operations and remove any or all of Sears' Property at its election from the Premises, and shall continue to pay Monthly Fixed Rent and Additional Rent for such period after the date this Lease automatically terminates. Sears shall not have any right to any portion of the proceeds of any award for a Condemnation Action, but shall have the right to make a separate claim for its loss of profit, relocation costs, goodwill, signage, personal property and trade fixtures and retain any award applicable thereto. Landlord shall cooperate with Sears in connection with such claim and Landlord shall not have any rights to recover any amounts in connection with such claim.

10.    **Default**.

(a)    **By Sears**.

(i)     Defaults by Sears are:  (A) failing to timely pay Monthly Fixed Rent or Additional Rent, if such Monthly Fixed Rent and/or Additional Rent is not paid within seven (7) Business Days after receipt of written notice from Landlord of nonpayment; or (B) failing to observe or perform any other material obligations of Sears hereunder for a period of thirty (30) days after receipt of written notice from Landlord of such failure (or such longer period as may be reasonably required to cure such failure, provided that Sears is diligently prosecuting such cure to completion). In the event of any default by Sears that could reasonably be expected to result in material damage to the Premises (which, for the avoidance of doubt, includes Sears' failure to perform Required CapEx as and to the extent required in Section 8(c)(i)), Landlord may give Sears written notice ("**Landlord Notice**") of Landlord's intention to cure any or all such defaults of Sears. Sears may, within five (5) days of the receipt of a Landlord Notice, either (i) bring an action in any court of competent jurisdiction disputing the existence of such default, or (ii) notify Landlord of Sears' intention to promptly pay to Landlord the reasonable cost of curing such default(s) upon demand including reasonable documentation of the actual, out of pocket costs of Landlord in curing such default(s). If Landlord has proceeded to cure Sears' default after expiration of Sears' response period without response from Sears, then Sears shall promptly pay to Landlord such reasonable and documented actual out-of-pocket costs, provided that no action by Landlord in a court of competent jurisdiction remains outstanding with respect to the existence of such default(s). As Landlord's additional remedy for a default by Sears, Landlord may give Sears written notice of Landlord's intention to terminate this Lease (the "**Default Termination Notice**") at the end of the expiration of thirty (30) days from the date of the giving of such Default

Termination Notice, and, in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term. No default shall be deemed to exist under clause (B) during any time the curing thereof is prevented by Necessary Curtailments provided that upon the cessation of such Necessary Curtailments (subject to <u>Section 9</u>) Sears shall prosecute such cure without further delay.

(ii)    If (A) Sears becomes bankrupt, makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for Sears or for the major part of its property; (B) a trustee or receiver is appointed for Sears or for the major part of its property; or (C) any voluntary or involuntary proceedings are filed by or against Sears under any bankruptcy, insolvency or similar laws, Landlord may give Sears written notice of intention to terminate this Lease (the "**Bankruptcy Termination Notice**") at the end of the expiration of thirty (30) days from the date of giving such Bankruptcy Termination Notice, and in such event, this Lease and the Term shall terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term.

(iii)    Upon any default by Sears under this Lease, Landlord may terminate this Lease and recover possession of the Premises. Once Landlord has terminated this Lease, Sears must promptly surrender the Premises to Landlord. On termination of this Lease, Landlord may recover from Sears all of the following; provided, that, in no event shall Sears be liable for any consequential, special, punitive or other similar damages:

(A)    The worth at the time of the award of any unpaid Rent that had been earned at the time of the termination; plus

(B)    The worth at the time of the award of the amount by which the unpaid Rent that would have been earned between the time of the termination and the time of the award exceeds the amount of unpaid Rent that Sears proves could reasonably have been avoided;

(C)    The worth at the time of the award of the amount by which the unpaid Rent for the balance of the Term after the time of the award exceeds the amount of unpaid Rent that Sears proves could reasonably have been avoided; provided, that, Sears shall be deemed to have delivered a Sears Termination Notice as of the earlier of the date of Sears' default giving rise to the termination of the Lease or the date of any actual delivery of a Sears Termination Notice; and

(D)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Sears' failure to perform obligations under this Lease, or which in the ordinary course of things would be likely to result therefrom, including any amounts incurred by Landlord to cure a default as provided in <u>Section 10(a)(i)</u> above, to the extent not otherwise paid by Sears.

(iv)    No member, partner (general or limited), manager, officer, director, shareholder or principal of Sears shall have any personal liability whatsoever for the payment or

collection of any judgment requiring the payment of money by Sears in the event of a default by Sears with respect to the terms, covenants and conditions of this Lease to be observed and/or performed by Sears.

(v)     If Landlord does not elect to terminate this Lease on account of any default by Sears, Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover all Rent as it becomes due; provided, that, Sears shall be deemed to have delivered a Sears Termination Notice as of the earlier of the date of Sears' default giving rise to Landlord's right to terminate the Lease or the date of any actual delivery of a Sears Termination Notice.

(vi)    Without regard to the provisions of Section 10(a)(i) above, in the event that Sears shall pay any installment of Rent more than five (5) Business Days after the date on which such installment is due, Sears shall pay to Landlord a late fee in the amount of two percent (2%) of the amount not timely paid (the "Late Fee") promptly upon receipt of written notice from Landlord demanding payment of the same; provided, that not more than once per Lease Year, no Late Fee shall be due until such unpaid amount is more than twenty (20) calendar days past due. The Late Fee shall be Additional Rent, and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

(b)     **By Landlord.**

(i)     Defaults by Landlord are (i) failing to timely pay any amount to be paid by Landlord hereunder, if such amount is not paid within seven (7) business days after receipt of written notice from Sears of nonpayment; or (ii) failing to observe or perform any other material obligations of Landlord hereunder for a period of thirty (30) days after receipt of written notice from Sears of such failure (or such longer period as may be reasonably required to cure such failure, provided that Landlord is diligently prosecuting such cure to completion). In the event of any default by Landlord, Sears may give Landlord written notice ("**Sears Notice**") of Sears' intention to cure any or all defaults of Landlord. Landlord may, within five (5) days of the receipt of a Sears Notice, either (i) bring an action in any court of competent jurisdiction disputing the existence of such default, or (ii) notify Sears of Landlord's intention to promptly pay to Sears the reasonable cost of curing such default(s) upon demand including reasonable documentation of the actual, out of pocket costs of Sears in curing such default(s). If Sears has proceeded to cure Landlord's default, then following delivery of a second Sears Notice, delivered not less than five (5) days after the first Sears Notice related to such default, allowing Landlord five (5) days to repay Sears reasonable and documented actual out-of-pocket costs, and, provided that no action by Landlord in a court of competent jurisdiction remains outstanding with respect to the existence of such default(s), Sears may set off against the Rent all reasonable actual, out-of-pocket, cost of curing all defaults of Landlord (including any costs associated with an action brought by Landlord disputing the existence of such default(s) to the extent such court of competent jurisdiction finds that any such default did exist) at the end of the expiration of five (5) days from the date of the giving of such second Sears Notice; provided, however, that Sears' right to set off shall be capped at 50% of Monthly Fixed Rent in any one month, with any additional amounts to be carried forward to the subsequent month(s). Sears shall also have the option in the Sears Notice, provided that no action by Landlord in a court of competent jurisdiction remains outstanding with respect to the

existence of such default(s), to terminate this Lease at the end of the expiration of thirty (30) days from the date of giving such Sears Notice (or if Landlord is then pursuing the cure of the default, then such longer period as may be reasonably required to cure such default, provided that Landlord is diligently prosecuting such cure to completion), and in such event, this Lease and the Term shall, except as set forth in the following sentence, terminate upon the expiration of such thirty (30) days with the same effect as if the last of such thirty (30) days was the date originally set forth herein for the expiration of the Term. If this Lease is terminated as provided herein, Sears, at Sears' election, shall have a period of up to one hundred twenty (120) Business Days (as elected by Sears), for the purpose of winding down its business operations and removing any or all of Sears' Property at its election from the Premises, but Sears shall continue to be obligated to pay Rent during any period of Sears' occupancy of the Premises. The provisions of this Section 10(b) shall survive the expiration or sooner termination of this Lease.

(ii)    No member, partner (general or limited), manager, officer, director, shareholder or principal of Landlord shall have any personal liability whatsoever for the payment or collection of any judgment requiring the payment of money by Landlord in the event of a default by Landlord with respect to the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord. In no event shall Landlord be liable for any consequential, special, punitive or other similar damages. Landlord's liability hereunder shall be limited to Landlord's interests in the Property.

11.    **Assignment/Subleasing.**

(a)    Sears shall have the right to sublet (and grant licenses and concessions, department arrangements and other rights) all or any portion of its leasehold interest during the Term without Landlord's approval; provided, however, that Sears shall not have the right to sublet all or any portion of its leasehold interest without Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed, if the term of such sublease is greater than two (2) years, unless Sears has an earlier termination right pursuant to such sublease (in which case Landlord shall not have such an approval right). Notwithstanding the foregoing, Sears shall have the right to sublet all or any portion of its leasehold interest to Seller during the Term without Landlord's approval. In addition, Sears shall have the right to assign its entire interest in this Lease, subject to Landlord's approval, such approval not to be unreasonably withheld, conditioned or delayed. In the event of any sublet or assignment, Sears (or any successor) shall remain liable to Landlord for the performance of all obligations under this Lease, except as otherwise set forth in Section 11(b) below.

(b)    Notwithstanding the foregoing, Sears shall have the right, without Landlord's approval, to (i) assign this Lease to any Subsidiary of Sears; (ii) assign or transfer all of Sears' rights and obligations under this Lease (either directly or indirectly, by operation of law or through a merger or other corporate transaction) to any other Person that (1) acquires all or substantially all of the assets of Sears, (2) is the surviving entity of a merger with Sears, or (3) results from a consolidation, reorganization or recapitalization of Sears with a solvent corporation, partnership or other legal entity; or (iii) assign or transfer all of Sears' rights and obligations under this Lease to any Person (if not the named tenant herein, the "**Unrelated Successor Tenant**") that has concurrently acquired another similarly situated property from Sears and a net worth of not less than $25,000,000.00 as of the effective date of such assignment or

transfer and the assignee assumes in writing the obligations of Sears under this Lease which arise on and after the date upon which the assignment becomes effective. In the sole case of an assignment or transfer in connection with clause (iii) above, Sears shall be released from all liability under this Lease. As used in this Lease, (x) "**Subsidiary**" means, as to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time of determination owned by such Person and/or one or more Subsidiaries of such Person, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person and/or one or more Subsidiaries of such person has more than a fifty percent (50%) equity interest at the time of determination and (y) "**Person**" or "**person**" means any natural person, partnership, limited partnership, limited liability company, corporation, trust, estate, association, unincorporated association or other entity. With respect to any assignment or transfer that requires Landlord's consent pursuant to Section 11(a) above or any assignment or transfer pursuant to this Section 11(b), Sears shall provide (i) written notice to Landlord no less than ten (10) Business Days prior to such assignment or transfer becoming effective, which notice shall identify the transferee and include reasonable documentation evidencing such transferee's satisfaction of the net worth requirement noted above, if applicable, and (ii) promptly following the date on which such assignment or transfer becomes effective, copies of the documentation evidencing the assignment of the Lease and the transferee's assumption of Sears' obligations under this Lease.

(c)    In the event of a sale or conveyance by Landlord of the Property (or any portion thereof), the same shall be made subject to this Lease and Landlord shall only be released from any liability under this Lease accruing after the date of any such conveyance, provided the assignee shall assume and agree to keep and perform all of the terms of this Lease on the part of Landlord to perform from and after the date of any such conveyance and a copy of the assignment and assumption agreement executed by Landlord and assignee shall be delivered to Sears, upon request.

12.    **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the state in which the Property is located applicable to agreements made, and to be wholly performed, in such state.

13.    **Waiver of Trial by Jury**. LANDLORD AND SEARS EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE OR THE LANDLORD-TENANT RELATIONSHIP, WHETHER ARISING IN CONTRACT, IN TORT OR OTHERWISE.

14.    **Binding Effect**. Subject to Section 11 above, this Lease shall bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

15.    **Complete Agreement; No Oral Modification**. This Lease may not be altered or terminated, nor may its provisions be waived, except in a writing signed by Sears and Landlord. This Lease, together with the PSA and the documents referred to in the PSA or executed in

connection with the Closing thereunder, represents the entire agreement and understanding of the parties with respect to the subject matter hereof, and completely supersedes and integrates any and all other promises, understandings and agreements between the parties (including all of the same by and between any of the parties' agents and representatives on behalf of the parties), both oral and written.

16.     **Counterparts.** This Lease may be executed in two or more counterparts and by facsimile or electronic signatures which taken together shall constitute collectively one agreement. In making proof of this Lease it shall not be necessary to produce or account for more than one such counterpart with each party's original, facsimile or electronic signature.

17.     **Invalidity.** If any term or provision of this Lease shall to any extent or for any reason be held invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be valid and enforceable to the fullest extent permitted by law, subject to such modification hereof as may be necessitated by such invalidity, illegality or unenforceability provided that the purpose and intent hereof is not in any way abrogated.

18.     **Notices.**

(a)     Notices shall be either (i) personally delivered, (ii) sent by a nationally recognized overnight courier delivery service, or (iii) mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If personally delivered, then such notices shall be effective when received as evidenced by affidavit of the Person making such delivery; if sent by overnight courier delivery service then such notices shall be deemed to have been received by the addressee on the next Business Day following the date so sent; if mailed, then such notices or other communication shall be deemed to have been received by the addressee on the fifth (5th) Business Day following the date deposited with the United States mail. The inability to make delivery because of changed address of which no notice was given or by reason of rejection or refusal to accept delivery of any notice shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept. All notices, demands or requests made pursuant to, under or by virtue of this Lease must be in writing and addressed as follows:

If to Sears:

Sears Holdings Corporation
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention: President – Real Estate
Telephone: (847) 286-5303

With copies to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Attention: W. Michael Bond, Esq.
Telephone: (212) 310-8035
Email: Michael.Bond@Weil.com

and

Sears Holdings Corporation
3333 Beverly Road, Dept. 824RE
Hoffman Estates, IL 60179
Attention: Associate General Counsel – Real Estate
Telephone: (847) 286-1719

If to Landlord:

LBA Realty LLC
3347 Michelson Drive, Suite 200
Irvine, California 92612
Attention: Melanie Colbert
Telephone: (949) 955-9345
Email: mcolbert@lbarealty.com

With copies to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
1901 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Attention: Anton N. Natsis
Telephone: 310.788.2430
Email tnatsis@allenmatkins.com

(b)     All notices (i) shall be deemed to have been given on the date that the same shall have been delivered in accordance with the provisions of this Section and (ii) may be given either by a party or by such party's attorneys. Any party may, from time to time, specify as its address for purposes of this Lease any other address upon the giving of five (5) days' prior notice thereof to the other parties.

19.     **Subject to Existing Agreements**. This Lease is subject to all Ancillary Rights and Agreements in effect on the Effective Date with respect to the Property to the extent affecting the Premises or this Lease.

20.     **Liens**. Sears shall not permit any mechanic's, laborer's or materialman's lien or other liens or encumbrances to be filed at any time against the Property or any part thereof by reason of work performed, materials furnished or obligations incurred with prior authorization by or on behalf of Sears or any agent or contractor claiming by, through or under Sears, which are not bonded or discharged within the later of thirty (30) days (a) of filing or (b) Sears' actual notice thereof. *In the event that, following ten (10) Business Days' notice from Landlord to Sears indicating that the above thirty (30) day period has expired and Sears has failed to bond or discharge to relevant unpermitted lien or encumbrance, Landlord may, at the expense of Sears,*

bond or discharge such lien or encumbrance; provided, that if Sears notifies Landlord that Sears is actively disputing such lien or encumbrance, Landlord may only bond (and not discharge) such lien or encumbrance for so long as Sears continues to actively dispute the same.

21.   **Estoppels**.  At any time and from time to time, upon not less than ten (10) Business Days' prior request, either party (the "**Requesting Party**") may request that the other party (the "**Certifying Party**") furnish to the Requesting Party (and its lenders or purchasers) a certificate (signed by a person duly authorized to sign on behalf of the Certifying Party) certifying as follows: (a) that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect and modified and setting forth the modifications), (b) the dates to which the Monthly Fixed Rent and any Additional Rent have been paid and the amount thereof then payable, (c) that the Certifying Party does not know of any default in the performance of any provisions of this Lease or specifying any default of which the Certifying Party may have knowledge and stating what action the defaulting party is taking or proposes to take with respect thereto and (d) any other information reasonably requested by the Requesting Party.

22.   If Sears is publicly traded, the terms of this <u>Section 22</u> shall not apply.  Otherwise, within thirty (30) days of Landlord's request, Sears will furnish its internally prepared financial statements.  Landlord will not disclose any aspect of Sears' financial statements that Sears designates to Landlord as confidential except to Landlord's mortgagee or prospective mortgagees or purchasers of the Property or if required by law or court order.  Sears shall not be required to deliver the financial statements required under this <u>Section 22</u> more than once in any twelve (12) month period and only in connection with a sale or refinancing of the Property.

23.   **Indemnification; Waiver of Subrogation**.

(a)   Each party shall indemnify, defend and hold the other harmless from and against all claims, actions, damages, liability and expense, including reasonable attorneys' fees ("**Loss**"), in connection with bodily injury, the loss of life, personal injury and/or damage to property to the extent arising from or out of any occurrence in or upon the Property to the extent caused by any act or omission of the indemnifying party and its agents, contractors, employees, servants or licensees, except to the extent that such Loss is caused by the wrongful or negligent acts or omissions of the other party, its agents, contractors, employees, servants or licensees (as to all of which Loss the party charged with such acts or omissions shall indemnify, defend and hold harmless the other party).

(b)   Each party releases and waives any and every claim and right of recovery against the other which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, which loss or damage is customarily covered by the property insurance carried by each party under this Lease, or would have been covered if each party had carried the insurance that such party is required to carry under this Lease.  This mutual waiver shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties.  Landlord and Sears agree to furnish to each insurance company which has or will issue property damage policies on its premises, notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

(c)     The provisions of this Section shall survive the Termination Date.

24.     **Hold Over.**  No holding over by Sears nor acceptance of Monthly Fixed Rent, Additional Rent or other charges by Landlord shall operate as a renewal or extension of this Lease without the written consent of Landlord.  Should Sears hold over after the Termination Date without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof; provided that, after the first thirty (30) days of holdover Sears' Monthly Fixed Rent shall be equal to one hundred twenty-five percent (125%) of the Monthly Fixed Rent otherwise due as of the date of the expiration or earlier termination of this Lease, and after the next thirty (30) days of holdover, Sears' Monthly Fixed Rent shall be equal to one hundred fifty percent (150%) of the Monthly Fixed Rent otherwise due as of the date of the expiration or earlier termination of this Lease.  If Sears holds over without Landlord's express written consent, and tenders payment of rent for any period beyond the Termination Date by way of check (whether directly to Landlord, its agents, or to a lock box) or wire transfer, Sears acknowledges and agrees that the cashing of such check or acceptance of such wire shall be considered inadvertent and not be construed as creating a month-to-month tenancy, provided Landlord refunds such payment to Sears promptly upon learning that such check has been cashed or wire transfer received.  Nothing contained in this Section 24 shall be construed as consent by Landlord to any holding over by Sears, and Landlord expressly reserves the right to require Sears to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease.

25.     **Sears Financing.**  Sears may continue to finance all receivables, inventory and other personal property and enter into financing leases of property and equipment, in the ordinary course of business.

26.     **Subordination; Quiet Enjoyment.**

(a)     Subject to and expressly conditioned upon the provisions of Section 26(b), including receipt of a commercially reasonable (as reasonably determined by Sears) subordination, nondisturbance and attornment agreement (an "**SNDA**") from each Landlord's mortgagee and each ground lessor, this Lease and all rights of Sears hereunder hereby are made and shall be subject and subordinate in all respects to the lien of all present and future ground leases (collectively, "**Ground Leases**") and mortgages (collectively, "**Landlord's Mortgages**") which may now or hereafter encumber Landlord's interest in the Property; provided that no such Ground Leases or Landlord's Mortgages shall increase any liabilities or obligations nor decrease any rights or remedies of Sears under or with respect to this Lease.  Sears shall respond to any request for signing an SNDA within thirty (30) days after request therefor.

(b)     Notwithstanding the foregoing or any such subordination, or any other provision contained in this Lease to the contrary, so long as Sears shall not be in default of the express provisions of this Lease beyond any applicable grace, notice or cure period, Landlord covenants and agrees that Sears shall peacefully and quietly possess and enjoy the Premises and all rights of Sears under this Lease in accordance with all terms and conditions hereof (without reference to Section 26(a) hereof), without let, hindrance or disturbance and free from all rights and claims of Landlord and all of all Persons claiming by or through Landlord, including under any such Ground Leases and Landlord's Mortgages.

27.   **Attorneys' Fees**. In the event of litigation between the parties to enforce this Lease or if any legal action is instituted as a result of a default by either party under this Lease that is not cured within the applicable cure period, the prevailing party in such action shall be entitled to recover from, or be reimbursed by the other party for, its reasonable and actual attorneys' fees and costs through all levels of proceedings.

28.   **Lease Not to Be Recorded; Leaseback Memorandum**. The parties agree that this Lease shall not be recorded, but the parties shall record a leaseback memorandum concurrently with the execution hereof.

29.   **Discretion**. Except as otherwise expressly provided herein, any agreement, approval, consent or other determination shall not be effective unless it is in writing and shall be in the sole and absolute discretion of such party.

30.   **Section Headings**. The headings of the various sections of this Lease have been inserted only for purposes of convenience, are not part of this Lease and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Lease.

31.   **General Definitional Provisions**.

(a)   Unless the context of this Lease otherwise requires, (i) words of any gender are deemed to include each other gender, (ii) words using the singular or plural number also include the plural or singular number respectively, (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Lease, (iv) the terms "Article," "Section," "Subsection," "Paragraph" or "clause" refer to the specified Article, Section, Subsection, Paragraph or clause of this Lease, and (v) all references to "dollars" or "$" refer to currency of the United States of America. The term "including" as used herein shall in all instances mean "including, but not limited to."

(b)   Initially capitalized terms used in this Lease are defined on the respective pages indicated in the following list and if not defined in this Lease shall have the respective meanings ascribed to them in the PSA.

| | | | |
|---|---|---|---|
| Additional Rent | 4 | Eastdil | 22 |
| Ancillary Rights and Agreements | 7 | Effective Date | 2 |
| Annual Fixed Rent | 4 | GOB Signage | 6 |
| Bankruptcy Termination Notice | 13 | Ground Leases | 21 |
| Business Day | 3 | Landlord | 2 |
| Casualty | 11 | Landlord Notice | 13 |
| Certifying Party | 19 | Landlord Retained Leases | 2 |
| Closing | 2 | Landlord Termination Notice | 3 |
| Condemnation Action | 12 | Landlord's Mortgages | 21 |
| Default Termination Notice | 13 | Late Fee | 14 |
| Deferred Maintenance Amount | 9 | Lease | 2 |
| Deferred Maintenance Period | 9 | Lease Year | 3 |
| Deferred Maintenance Work | 9 | Loss | 20 |

| | | | |
|---|---|---|---|
| Maintenance Standard | 9 | Required CapEx Max | 10 |
| Monthly Fixed Rent | 4 | Sears | 2 |
| Necessary Curtailments | 6 | Sears Notice | 14 |
| person | 16 | Sears' Property | 3 |
| Premises | 2 | Seller | 2 |
| Prepaid Rent | 2 | SNDA | 21 |
| Property | 2 | Subsidiary | 16 |
| PSA | 2 | Taxes | 4 |
| Rent | 5 | Term | 3 |
| Representatives | 2 | Termination Date | 3 |
| Requesting Party | 19 | Unrelated Successor Tenant | 16 |
| Required CapEx | 10 | | |

32.  **Joint Drafting.**  Each of Sears and Landlord has been represented by counsel in the negotiation and execution of this Lease, and each of Sears and Landlord had input in the drafting of this Lease.  For all purposes, this Lease shall be considered to have been jointly drafted by Sears and Landlord.

33.  **Other Documents.**  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

34.  **Brokers.**

(a)  Sears represents and warrants to Landlord that Sears has not dealt with any broker, salesman, finder or consultant with respect to this Lease or the transactions contemplated hereby other than Eastdil Secured ("**Eastdil**").  Sears shall pay Eastdil in accordance with Section 10.3(a) of the PSA.  Sears agrees to indemnify, protect, defend and hold Landlord harmless from and against all claims resulting from Sears' breach of the foregoing representation.

(b)  Landlord represents and warrants to Sears that neither Landlord nor any Affiliate of Landlord has dealt with any broker, salesman, finder or consultant with respect to this Lease or the transactions contemplated hereby.  Landlord agrees to indemnify, protect, defend and hold Sears harmless from and against all claims resulting from Landlord's breach of the foregoing representation.

34.  **Confidentiality.**  Sears and Landlord agree to keep and hold this Lease and the terms and conditions contained herein strictly confidential and neither Sears nor Landlord will disclose or permit any other Person to disclose the terms and conditions of this Lease to any other Person without the prior written authorization of the other party.  Notwithstanding the foregoing, Sears and Landlord may disclose this Lease and/or the terms and conditions hereof to Sears' and Landlord's respective agents, consultants, affiliates, directors, accountants, advisors, partners, employees and legal counsel ("**Representatives**") provided that such Representatives have a legitimate need to know and agree to keep the terms and conditions strictly confidential in accordance with this Section 35.

35.   <u>Additional State-Specific Provisions</u>. The provisions and/or remedies which are set forth on the attached <u>Exhibit D</u> shall be deemed a part of and included within the terms and conditions of this Lease.

36.   <u>Prepaid Rent</u>. On the Effective Date, Sears shall provide Landlord with an amount equal to $2,385,798.90 (i.e., twelve (12) months of Monthly Fixed Rent otherwise due during months seven (7) through eighteen (18) of the Term) (the "<u>Prepaid Rent</u>"), as prepaid rent due under this Lease for months seven (7) through eighteen (18) of the Term.  Provided Sears is not then in default under this Lease beyond any applicable notice or cure period, Landlord shall apply the Prepaid Rent to Sears' obligation to pay Monthly Fixed Rent as and when due until the entire amount of the Prepaid Rent has been exhausted; provided, however, if this Lease is terminated due to a Landlord default, casualty, condemnation, or the early termination rights described in <u>Section 3</u> above, then Landlord shall promptly return the unapplied portion of the Prepaid Rent to Sears.

**[Signatures appear on the following pages]**

**IN WITNESS WHEREOF,** Landlord and Sears have executed and delivered this Lease to each other as of the Effective Date.

**SEARS:**

**SEARS HOLDINGS CORPORATION,**
a Delaware corporation

By: _____

Name: Joseph F. Jordan

Title: Vice President + Controller

[SIGNATURE PAGE TO LEASE (1 IMESON PARK BOULEVARD, JACKSONVILLE, FL]

**LANDLORD:**

**1 IMESON PARK BLVD, LLC,**
a Delaware limited liability company

By:   1 Imeson Park Blvd Holding, LLC,
      a Delaware limited liability company,
      its sole Member and Manager

      By:   LBA Fund VI-MM Industrial, LLC,
            a Delaware limited liability company,
            its sole Member and Manager

            By:_____
              Name:___Steve Layton_____
              Title:___Authorized Signatory___

[SIGNATURE PAGE TO LEASE (1 IMESON PARK BOULEVARD, JACKSONVILLE, FL)]

## EXHIBIT A

### Legal Description

FEE PARCEL:

A parcel of land lying in Section 13, Township 1 South, Range 26 East, and in Sections 7 and 18, Township 1 South, Range 27 East, Jacksonville, Duval County, Florida, said parcel of land being more particularly described as follows: For Point of Reference commence at an iron pipe at the northwest corner of said Section 18 and run South 88° 35' 52" East 108.57 feet to a point on the southeasterly right-of-way line of the proposed right-of-way of North Main Street Drive for the Point of Beginning.

From the Point of Beginning thus described run North 55° 09' 30" East along said proposed southeasterly right-of-way 125.41 feet to a Point of Curvature; run thence in a northeasterly direction along the arc of a curve in said proposed southeasterly right-of-way line, said curve being concave to the northwest and having a radius of 568.82 feet, a chord distance of 224.59 feet to a point, the bearing of the aforementioned chord being North 43° 46' 21" East; run thence Due East along a line having a "Y" coordinated value of 2,215,000 based on the Florida State Plane Coordinate System for the eastern portion of Florida, a distance of 1,956.40 feet to a Point of Curvature; run thence in a northeasterly direction along the arc of a curve concave to the northwest and having a radius of 508.34 feet, a chord distance of 491.30 feet to a point, the bearing of the aforementioned chord being North 61° 06' 10" East; run thence South 0° 01' 07" West, 1,620.75 feet to a Point of Curvature; run thence in a southwesterly direction along the arc of a curve concave to the northwest and having a radius of 605.92 feet, a chord distance of 528.36 feet to the Point of Tangency of said curve, the bearing of the aforementioned chord being South 25° 52' 02" West; run thence South 51° 42' 57" West 696.21 feet to a point on the northerly right-of-way line of proposed Imeson Boulevard; run thence the following courses and distances along the northerly right-of-way line of said proposed Imeson Boulevard; first course, North 89° 59' 59" West 1,633.73 feet to a Point of Curvature; second course, along the arc of a curve concave to the north and having a radius of 894.93 feet, a chord bearing and distance of North 73° 12' 44" West 516.95 feet to a point of tangency; third course, North 56° 25' 30" West 310.02 feet to a Point of Curvature; fourth course, along the arc of a curve concave to the northeast and having a radius of 134.59 feet, a chord distance and bearing of North 26° 02' 41" West 136.13 feet to a Point of Compound Curve on the easterly right-of-way line of said proposed North Main Street Drive; run thence the following courses and distances along the easterly right-of-way line of said proposed North Main Street Drive: first course, along the arc of a curve concave to the east and having a radius of 683.58 feet, a chord bearing and distance of North 8° 29' 49" East 99.21 feet to a Point of Tangency; second course, North 12° 39' 30" East 268.14 feet to a Point of Curvature; third course, along the arc of a curve concave to the east and having a radius of 2,829.86 feet a chord bearing and distance of North 14° 30' 50" East 183.26 feet to the Point of Tangency; fourth course, North 16° 22' 10" East 769.64 feet to a Point of Curvature; fifth course, along the arc of a curve concave to the southeast and having a radius of 626.47 feet, a chord bearing and distance of North 35° 45' 52" East 416.07 feet to the Point of Tangency and the Point of Beginning of this description.

EXHIBIT A
-1-

Exception therefrom those lands described in Special Warranty Deed recorded in Official Records Book 6886, Page 649, and Special Warranty Deed recorded in Official Records Book 7831, Page 1607, of the Public Records of Duval County, Florida.

EASEMENT PARCEL:

TOGETHER WITH an easement for utilities service and maintenance as reserved in the Deed recorded April 15, 1994 in Official Records Book 7831, Page 1607, over the land conveyed in said deed.

# **EXHIBIT B**

The **"Premises"** means the entirety of the Property together with all improvements located thereon.

.

## EXHIBIT C
## [RESERVED]

## EXHIBIT D
### State Specific Provisions

1.    <u>Radon Gas</u>. The following notification is provided under Section 404.056(6), *Florida Statutes: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.* Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

## SCHEDULE 1
## Landlord Retained Leases

None.

## SCHEDULE 2
### Annual Fixed Rent

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1 | $2,350,540.80 | $195,878.40 |
| 2 | $2,421,057.02 | $201,754.75 |
| 3 | $2,493,688.73 | $207,807.39 |
| 4 | $2,568,499.40 | $214,041.62 |
| 5 | $2,645,554.38 | $220,462.86 |
| 6 | $2,724,921.01 | $227,076.75 |
| 7 | $2,806,668.64 | $233,889.05 |
| 8 | $2,890,868.70 | $240,905.72 |
| 9 | $2,977,594.76 | $248,132.90 |
| 10 | $3,066,922.60 | $255,576.88 |

**SCHEDULE 3**
**DEFERRED MAINTENANCE WORK**

- the No. 2 chilled and induced draft cooling tower located within the Premises with a comparable tower as determined by Landlord.

- Fire Life Safety – replace approximately 20% of the fire sprinkler piping within the entirety of the Premises.

- Other – renovate 2 restrooms within the Premises to cause such restrooms to comply with all applicable state and federal laws, ordinances, and building codes, including without limitation the ADA; install 1 wheelchair accessible urinal in the employee restroom in compliance with the foregoing applicable laws; add 1 van accessible parking space in the Property parking facilities in an exact location reasonably determined by Landlord and corresponding signage; reconfigure existing parking spaces in the Property parking facilities to include a marked van accessible aisle